**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**SLIMAMERICA, INC., Frank J. Sarcone, and Robert Wyman, Defendants.**

Case No. 97–6072CIV. ·

United States District Court, S.D. Florida.

June 30, 1999.

David Spiegel, Washington, DC, for plaintiff.

Guy Rasco, Miami, FL, Sheldon S. Lustigman, New York City, for defendant.

### FINAL JUDGMENT FOR PERMANENT INJUNCTION AND DAMAGES

FERGUSON, District Judge.

This action was brought by the Federal Trade Commission seeking permanent injunctive and other equitable relief against SlimAmerica, Inc. ("SlimAmerica"), Frank J. Sarcone ("Sarcone") and Robert Wyman ("Wyman"). The relief sought includes consumer restitution for alleged violations of § 5(a) and 12 of the Federal Trade Commission Act ("FTC"). 15 U.S.C. §§ 45(a) and 52, which prohibits deceptive acts and practices and false advertisements for food, drugs, devices, or cosmetics in or affecting commerce.

Sarcone has a long record of assorted fraudulent schemes which have bilked thousands of victims out of millions of dollars in more than a dozen states. Orders to cease and desist and to make restitution, entered by several governmental entities, have gone largely ignored. In this scheme he has transferred the ill-gotten gains to a foreign country in an effort to place these funds beyond the Court's reach for consumer redress.

The Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C.

§§ 1331, 1337(a), 1345 and 15 U.S.C. § 53(b).

### The Parties

The Federal Trade Commission is an independent agency of the United States government created by statute. Sarcone[1] is the founder, president, treasurer, secretary and director of SlimAmerica. He is also an officer and/or director of the following companies: Peltec Publishing, Inc., American Direct, Diet Direct, Creative Marketing, Inc., XQuisite Skin Care, and Varig. Ltd.

Wyman began working at SlimAmerica as a general manager in 1996. Company correspondence on behalf of the corporation described Wyman as both the Vice President and the Director of Marketing. In that capacity he implemented, supervised and participated in operating the company's computer system; maintained payroll and other financial records; and participated in the drafting of SlimAmerica's customer service script. Wyman also supervised the "phone room" and customer service staff, which processed consumer inquiries, complaints, and refunds. Along with Sarcone. Wyman is co-director and officer in at least four other companies: American Direct, Inc., Diet Direct, Inc., Creative Marketing International, and XQuisite Skin Care, Inc.

### Findings of Fact

SlimAmerica was founded by Sarcone in 1995. The company was incorporated in the state of Nevada and later registered as a foreign corporation in the state of Florida. During 1994 and 1995. Sarcone sought financial backing for a new weight loss product from an individual named Larry Williams ("Williams"). In 1995, Sarcone and Williams entered into a partnership arrangement to manufacture and market the product, with Williams contributing cash in the amount of $200,000 – $250,000. In September 1995, SlimAmerica began promoting a weight loss program titled the Super–Formula Program ("Super–Formula"). Super–Formula consists of three separate diet pills: "Slim–Again," "Absorbit–ALL," and "Absorbit–ALL PLUS." According to SlimAmerica's ads, the three pills contain four different ingredients that produce Super–Formula's weight loss benefits. Slim–Again contains chromium picolinate and HCA; Absorbit–ALL contains chitin; and Absorbit–ALL PLUS contains glucomannan. The defendants sold a 30–day supply of Super–Formula for $49.95, a 60–day supply for $89.95, and a 90–day supply for $129.95. From September 1995 through January 1996, Williams, through his company. Commodity Timing, Inc., provided at least $193,336 for advertising and other startup costs associated with the marketing of Super–Formula.

From September 1995 through January 1997, advertisements for Super–Formula appeared in several hundred newspapers and magazines throughout the United States, including Ladies Home Journal. McCall's Magazine, and Cosmopolitan. Sarcone edited, reviewed and approved all advertising copy for Super–Formula. Nancy Jones & Associates, solely owned and operated by Nancy Jones a/k/a Nancy Drew, handled all media placements of the defendants' advertising. During 1996 the defendants spent at least $2.5 million to advertise and otherwise promote Super–Formula. The advertisements made the following representations:

- **"Blast All Your Excess Body Fat Off You Whether Your Stubborn Metabolism Likes It Or Not!"**

- "Yes, as utterly amazing as it seems, someone has finally combined three of the worlds most powerful weight-loss weapons ever into one explosive 'Super–Formula Program'® that is absolutely guaranteed to blast up to 49 pounds off you in only 29 days!

- "Don't need to loose that much weight? Fine, because this aston-

---

[1]. Sarcone has used the last name "Sarcona" in connection with SlimAmerica. In other business dealings Sarcone/Sarcona has been referred to by the name, "Frank Johns."

ishing new 'Super–Formula'® can annihilate up to 29 pounds of flab in only 14 days . . . up to 12 pounds in only one short week and yes it can force up to 7 ugly pounds to instantly disappear in as little as 48 hours!

- "No discipline! No 'Soul Searching' Will Power! No Starvation! No Back–Breaking Exercise! Eat Up To Six Times A Day!
- "Dramatic Proof From a Leading U.S. Medical School."

At all times, the advertisements for Super–Formula made the following representations:

- "FINALLY!! Medical Science has 'Combined' Three of the World's Most Powerful Weight–Loss Weapons Into One Super–Formula . . . and It's Guaranteed. . . ."
- "Blasts Away Up to 50% of Your Body Fat in Record Time . . . Obliterates Up to 5 Inches From Your Waistline . . . And Zaps 3 Inches From Your Thighs Before You Know It."
- "You can now get that shapely, sexy body you've always dreamed of . . . without discipline . . . without 'soul searching' will power. . . ."
- "clinically proven in numerous scientific studies in major universities and medical centers world-wide"

Employees in SlimAmerica's customer service department told consumers inquiring about Super–Formula that they need not diet or exercise to realize the benefits set forth in the company's advertisements. Super–Formula made similar representations in promoting the product through a home page on the Internet.

**2.** In 1991, 1993 and 1996, Retzer suffered a series of strokes. In 1994, he had a major heart attack and subsequently heart bypass surgery. Since at least 1993 or 1994, well before he purportedly endorsed Super–Formula, Retzer experienced memory loss, difficulty in oral communication, shortness of breath, depression, and dementia or senility. In January 1997, he entered an assisted living facility in Palm Springs and attended a stroke center. In June 1997, Retzer entered Senior

### Fraudulent Medical Endorsement

All advertisements for Super–Formula included an endorsement from Howard Retzer, M.D. ("Retzer") Retzer, a retired physician born in 1925, last operated a medical office practice about June 1977.[2] The endorsements purported to be based on Retzer's review of "the numerous and conclusive clinical studies and test results that have been conducted on each of the remarkable products that make up this 'Super–Formula.'" Initial advertisements for Super–Formula described Retzer as past president of The American College of Nutrition. Contrary to representations in the defendants' ads. Retzer has never been president, nor has he been a member of The American College of Nutrition.[3] No evidence was produced showing that Retzer was ever past president of the American College of Endocrinology and Nutrition, or that a Research Institute of Metabolism and Nutrition ever existed. Sarcone, admittedly, authored the Howard Retzer endorsement for Super–Formula. The endorsement was signed by Retzer on October 20, 1995—almost a month after SlimAmerica ran its first Super–Formula ad.

Although Sarcone was made aware, as early as February 5, 1996, that Retzer's organizational affiliation might not be valid and was informed by Retzer himself in a letter of March 26, 1996 that he was not a member of the American Council of Nutrition ("ACN"), the defendants continued to run the misleading Super–Formula advertisement until June 18, 1996. Retzer was paid $2.000 per month for his endorsement of Super–Formula, pursuant to a written agreement executed on October 20, 1995. The photograph of the younger man in a

Visions assisted living home in Littleton, Colorado and later was moved to the Mariner Health of Greenwood nursing home in the same town.

**3.** The American College of Endocrinology and Nutrition and The Research Institute of Metabolism and Nutrition—two other groups named in defendants' ads for which Retzer is allegedly past president—are not recognized groups among nutrition professionals.

white coat next to Retzer's endorsement, which appeared in all of the defendants' advertising from at least September 29, 1995 until January 29, 1997, was not a photograph of Retzer. According to Sarcone it was "a stock photo that anybody can rent." Sarcone claimed that the photograph "was never intended to be a picture of Doctor Retzer."

On March 28, 1996, because of complaints from ACN members regarding SlimAmerica's advertising, Stanley Wallach, M.D., president of the requested that the National Advertising Division ("NAD") of the Council of Better Business Bureaus investigate SlimAmerica's advertising. The NAD conducted a three-month investigation of the ACN complaint which included a review of extensive submissions from the ACN and SlimAmerica. In his capacity as Vice President of Marketing, Wyman represented the company in some of the investigative proceedings.

SlimAmerica's customer service department also received numerous complaints and requests for refunds from Super–Formula purchasers. Accounting records reflect that for the year ended December 31, 1996, refunds totaled $1.15 million. The complaints involved, among other things, non-delivery, side effects caused by Super–Formula, total ineffectiveness of the product, and allegations that the defendants were double and triple charging consumers' accounts. In response to the complaints, the defendants began sending letters to customers advising them that SlimAmerica would provide remuneration for persons who would give testimonials for use in advertisements as to positive weight loss experiences based on use of Super–Formula. SlimAmerica paid $1,000 to the persons whose testimonials for Super–Formula appeared in their new newspaper and magazine advertisements.

In July 1996 the NAD issued a decision concluding that SlimAmerica had "failed to provide a reasonable basis for its claims of product efficacy and performance." The decision questioned the scientific validity of various "studies" which the company had submitted in support of Super–Formula, characterizing these as "anecdotal", rather than "competent scientific evidence." It found further that the defendants' studies dealt with single ingredients in Super–Formula, rather than the "effects ... when taken in unison." With respect to Retzer, the agency ruled that the company had failed to confirm or had misrepresented his credentials as set forth in its ads. SlimAmerica appealed the NAD decision to the National Advertising Review Board ("NARB") of the Better Business Bureau. Following a hearing on September 18, 1997, the NARB affirmed the NAD decision and concluded that "the claims [in SlimAmerica's ads] should be discontinued immediately." In their response to the NARB ruling, the defendants stated, "we intend to comply with the decision of the NARB." They responded further that the company was "currently revising advertisements and will comply with FTC regulations and guidelines and will address concerns of the NAD."

While the investigation was in process, and after NARB's decision was entered, the defendants were still shipping approximately 700–900 parcels of Super–Formula daily. Total sales of Super–Formula during 1996 alone were at least $9.52 million. On January 27, 1997, the Federal Trade Commission filed this action to secure a temporary injunctive relief, a permanent injunction, recission of contracts, restitution, disgorgement, and other equitable relief. On the FTC's motion this Court entered an *ex parte* temporary restraining order and appointed a receiver. After a lengthy evidentiary hearing an order granting preliminary injunction was entered. The parties were back before the Court to commence a non-jury trial in December 1997.

### Defendants' Misrepresentations Regarding Post–Preliminary– Injunction Employment

1. *Defendant Wyman's Misrepresentations*

Section IV.A of the Court's July 2 1997 preliminary injunction order ("July 2 or-

der") required the defendants Wyman and Sarcone to "make and keep accurate records reflecting any and all funds or assets received from any source after the effective date of the order, and any and all expenditures after the effective date of the order totaling $100 or more, including, without limitation expenditures for living and business expenses". Section IV.B.a of the July 2 order required the defendants to file quarterly reports, beginning on August 1, 1997, of all funds and assets received "from any source after the effective date of this order." Section IV.B.b required Sarcone and Wyman to include the "name, address, and telephone number" of the sources of post-order income. Finally, Sections IV.B.c and d required Sarcone and Wyman to report post-order expenditures in excess of $100, along with the name, address, and telephone number of the payees.

On August 1, 1997, in a letter submitted by their counsel, the defendants made the first quarterly report required by this Court's July 2 order. In response to the requirement to report funds or assets received during July 1997, the defendants reported that Wyman had received $4,500 for "computer consulting and programming" involving a "company based in New York." The company was described as "involved with preschool and the arts" and "not engaged in any telemarketing." Wyman failed to disclose the name of the company.

At a deposition held on September 3–4, 1997, Wyman testified that the New York company named in his counsel's August 1, 1997 letter had paid him "$8,000, maybe $9,000." He testified that since the commencement of this lawsuit, he had worked only for this New York company and had done "computer work" for "a couple of attorneys that threw me a couple dollars because they knew my hands were tied." Wyman further testified he had not worked for anyone else; had not provided "consulting services" for anyone else; and confirmed that the representations in his counsel's August 1, 1997 letter set forth above were true and correct. At that

same deposition. Wyman testified he had not been involved in any business with Sarcone since the start of this action and had "no intentions in the near future to go into business with Mr. Sarcona." Finally, when asked whether he knew of Sarcone's business or employment activities Wyman testified. "I don't have a clue as far as business is concerned", and that he had no idea how Sarcone was supporting himself. That testimony was false.

In fact, beginning in March 1997, the defendants Wyman and Sarcone had both been conducting business on behalf of a company called Renew Skin Care, Inc. ("Renew"). Renew markets skin care products through advertisements, telemarketing, and direct mail. Claims were made in promotional literature that the product removes "lines and wrinkles" from users' faces and "Eliminate[s] The Need For Plastic Surgery...." Renew was incorporated in Nevada on April 9, 1997, and began doing business at the end of June 1997. Between the end of June and November 19, 1997, total sales of Renew products were approximately $500,000.

Wyman's involvement with Renew included at least the following: (1) during April 1997, negotiating, together with Sarcone, a contract with Frontier Communications to provide telemarketing services for Renew; (2) during the summer of 1997, consulting with Cooper in connection with Renew; (3) participating in the revision of Renew's telemarketing scripts; (4) receiving and reviewing consumer complaints about Renew's products from telemarketers; and (5) supervising the transfer or credit card or check orders by the company's telemarketers.

As compensation for his Renew work, Gary Cooper ("Cooper") paid Wyman a salary of at least $2.000 per month, plus personal expenses of at least $3.000 per month. The payments to Wyman were made through a "shelf" or "shell" corporation known as Total Medical Services, Inc. Actual payments to Wyman between July 29 and October 21, 1997 were approximate-

ly $34,300. Of these payments $28,300 came from an account in a Nevada bank and $6,000 from an account in a Florida bank. In his August 1, 1997, report to the Commission, however, Wyman did not disclose the funds he received in July 1997 in connection with his Renew work, thereby violating Section IV.B of the July 2 order. In addition, Wyman failed to disclose his work for and compensation from Renew in response to questions by the Commission.

### 2. Defendant Sarcone's Misrepresentations

At a deposition held on September 3–4, 1997. Sarcone testified that since the filing of this case he worked as a "consultant" and that his clients were involved in "medical type products, medical beds, products that are used for cleaning, products that are basically utility type products." Sarcone also asserted that his only business dealings with Wyman since the filing of this action consisted of talk about "ideas for the future ... nothing is really concrete or anything. It's just for the future." That testimony was false.

In fact, beginning in March 1997, and continuing through at least October 1, 1997, Sarcone conducted business on behalf of Renew. Cooper, Renew's president had known Sarcone since 1993 and had done business with him in Renew and other commercial projects. Sarcone provided Cooper with the concept and startup materials for Renew, including advertising, product scripts, a telephone company to handle calls from Renew consumers, and a firm to write refund checks for Renew customers. Sarcone also introduced Cooper to Wyman. From July to September 1997, Sarcone had frequent communications with Renew's vendors regarding scripts, servicing of consumer calls, and refunding payments to disgruntled consumers.

Between April and June 1997. Cooper paid Sarcone at least $10,000 for the Renew concept. In addition, Cooper paid Sarcone's monthly rent and utilities for April, June and August in the amount of $2.163. When questioned about his business activities on September 3–4 and October 7, 1997 Sarcone failed to disclose his work for Renew, the fact that he had been involved in Renew with Wyman, and the above payment arrangements.

### Other Similar Conduct and Proceedings

Prior to this action there have been at least thirteen (13) separate state court or administrative orders entered against either Sarcone or his companies resulting from fraud investigations by state attorney generals, regulatory agencies, or the United States Postal Service. The proceedings were triggered by the activities of three companies which operated from at least 1983 to 1991: Forever Thin Weight Loss Clinic, Inc. ("Forever Thin"), Amerdream, Inc. ("Amerdream"), and Advanced Automotive Technology, Inc. ("AAT"). Forever Thin and Amerdream involved diet schemes that were similar to that of SlimAmerica. AAT involved a telemarketing scheme to sell a bogus gas saving device. All three companies, like SlimAmerica, used telemarketing and direct mail programs.

### 1. Forever Thin

From at least 1983 to 1985, Sarcone was the owner and director of Forever Thin. Through direct mail solicitations, the company marketed and sold a product called "Forever Thin." The proclaimed principal weight loss ingredient in Forever Thin was glucomannan. Advertisements for the product promised that a user could lose up to six pounds in the first 48 hours, up to 12 pounds even two weeks thereafter, and that any weight loss through the diet program would be "permanent."

On June 28, 1984, following the filing of an administrative complaint by the United States Postal Service, Sarcone agreed to a Cease and Desist Order which prohibited the following representations: (1) "persons using Forever Thin (glucomannan) capsules will achieve weight loss without a calorie restricted diet" and (2) "the use of the Forever Thin program will cause a

rapid and substantial weight loss, e.g., up to 6 pounds the first 48 hours ... 12 pounds every two weeks thereafter." On July 15, 1985. Sarcone signed an Assurance of Voluntary Compliance in a proceeding brought against Forever Thin by the State of Utah. Among other things, Sarcone agreed to make refunds to Utah consumers who failed to receive Forever Thin or had complained about its effectiveness.

## 2. *Amerdream*

From 1985 through 1991, Sarcone was president of various companies doing business as Amerdream Corporation, Amerdream International, Inc., and Amerdream Securities, Inc. (collectively "Amerdream"). Sarcone owned Amerdream and controlled all aspects of its operation. Amerdream sold a product called "The Ultimate Solution Diet Program." The principal ingredient in Amerdream's weight loss product was glucomannan—the same substance used in Forever Thin and subject of the United States Postal Service and Utah consent orders. Promotional materials for the program claimed. "After the first week, some individuals will see losses of up to 35 pounds ... an extremely overweight person could easily drop 40, 65, even 100 pounds or more." Promotional materials also contained endorsements by alleged experts. Further, the materials stated that a $1,000 United States Government bond would be provided to any participant who made the program's minimum purchase for $129.95.

In separate proceedings, state law enforcement or administrative agencies in four states—Georgia, Pennsylvania, Wisconsin, and Florida—charged that Amerdream's marketing practices and claims were false. Sarcone agreed to consent orders in the states of Georgia, Pennsylvania, and Wisconsin enjoining the marketing claims and practices of Amerdream. In the Florida proceeding. Sarcone was

served with a complaint and filed an answer through an attorney. Subsequently, Sarcone defaulted and a final judgment was entered which enjoined him from engaging in unfair or deceptive sales of consumer goods or services and ordered the defendants to pay $1.8 million for violations of Florida law.[4]

## 3. *Advanced Automotive Technologies*

From 1990 to 1991. Sarcone was associated with the company AAT. He was one of the incorporators of AAT, its only director, as well as its president and vice president. AAT telemarketed "Petromizer", which was described as a fuel saving and emission control device for automobiles. It sold at prices ranging from $59.95 to $79.95.

Six states—Arizona, Louisiana, Minnesota, Ohio, Oklahoma, and Texas—obtained injunctions and/or monetary judgments based on complaints that AAT had misrepresented Petromizer's benefits. The Louisiana judgment was by consent; the other judgments were by default. In addition to the state court cases, the United States Postal Service filed an administrative complaint charging that AAT made false representations in its advertisements. Sarcone signed with the United States Postal Service on June 28, 1991, a settlement agreement which incorporated a cease and desist order.

## 4. *Other Litigation Involving Amerdream and AAT*

On April 2, 1991, the Federal Trade Commission filed a complaint against Sarcone, Amerdream, AAT and other defendants in the United States District Court for the District of Arizona, charging that they had committed deceptive acts and practices in violation of Section 5(a) of the Federal Trade Commission Act. 15 U.S.C. § 45(a). Neither Sarcone, AAT, nor any of the Amerdream defendants filed an an-

---

**4.** At the time of trial, Sarcone had not paid the $1.8 million judgment, nor had he moved

to vacate the judgment.

swer or any responsive pleadings to the Commission's complaint. A default judgment was entered on May 9, 1991. On November 5, 1991, pursuant to a motion by the Commission regarding the continuing default of Sarcone and Amerdream, the Court entered a permanent injunction and order of redress against Sarcone and the Amerdream corporate defendants. Among other things, the permanent injunction enjoined Sarcone and other defendants from making false statements, "orally or in writing", with respect to the future marketing of "any diet product, program, or service." including but not limited to:

"any misrepresentation concerning the identity of individuals or groups that tested the product, program, or service, the results of such tests, or any other facts concerning tests of the performance, safety or efficacy of the product, program, or service, or any component thereof. . . . "

The order on redress also directed the defendants to pay the Commission $50.862.[5] On December 18, 1991, pursuant to a motion by the Commission regarding the continuing default of Sarcone and AAT, the Court issued another permanent injunction and order against Sarcone and AAT directing the defendant to pay $622.634 in consumer redress.[6]

### Conclusions of Law

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits deceptive acts or practices in or affecting commerce. Misrepresentations or omissions of material facts made to induce the purchase of goods or services constitute deceptive acts or practices that violate § 5(a) of the FTC Act. *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir.1988); *FTC v. Wilcox*, 926 F.Supp. 1091, 1098 (S.D.Fla.1995). A representation or omission is material if it is of the kind usually relied on by a reasonably prudent person. *FTC v. Wolf*, 1996 WL 812940, 1997–1 Trade Cas. (CCH) ¶ 71,713 at 79,078 (S.D.Fla.1996); *FTC v. Jordan Ashley, Inc.*, 1994 WL 485793, 1994–1 Trade Cas. (CCH) ¶ 70,665 at 72,096 (S.D.Fla.1994). Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir.1994), *cert. denied*, 514 U.S. 1083, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995); *Wilcox*, 926 F.Supp. at 1098. Because defendants's claims were expressly made or deliberately implied to induce the purchase of defendants' "Super Formula" weight-loss pills, they are material.

Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits false advertisements for foods, drugs, devices, or cosmetics in or affecting commerce. The Super–Formula weight-loss products sold by defendants are a "food" and/or "drug" for purposes of §§ 12 and 15 of the FTC Act, 15 U.S.C. §§ 52 and 55. A § 12 violation is established by a showing that "the express or implied message conveyed by an ad is false." *Pantron I Corp.*, 33 F.3d at 1096 (citing *In re Thompson Medical Co., Inc.*, 104 F.T.C. 648, 818–19 (1984)).

The existence of a money-back guarantee, such as the one alleged for Super–Formula in this case, is neither a cure for deception nor a remedy for consumer injury. *See Pantron I Corp.*, 33 F.3d at 1103 ("[b]ecause even many unsatisfied customers will not take advantage of a money-back guarantee, a company which has engaged in consumer fraud would be able to retain a significant portion of the proceeds simply by making a largely illusory money-back offer"); *Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 671 (7th

---

**5.** At the time of trial approximately $46,000 of the Amerdream judgment remained unsatisfied. Moreover, the unlawful acts which are the subject of the suit may be violative of the judgment entered by the Arizona federal court.

**6.** At the time of trial, $586,000 of the AAT judgment remained unsatisfied. Sarcone was personally served with copies of the Amerdream and AAT permanent injunctions. He appeared through an attorney but decided against challenging the judgments.

Cir.1967) ("[Petitioner] cannot rely, as it attempts to do, upon a general company money back guarantee policy. [S]uch a defense, as the Commission argues, would make the false advertising prohibitions of [the FTC] Act a nullity. Anything might then be falsely advertised as long as unsatisfied customers were returned their money"). Further, the existence of some "satisfied" customers is not a defense to FTC Act liability. *Basic Books, Inc. v. FTC,* 276 F.2d 718, 721 (7th Cir.1960).

 The defendants in this action falsely represented, expressly or by implication, that: (1) Super–Formula will cause substantial, specified weight loss in a brief, specified period of time, without the need to exercise or diet, (2) Super–Formula will cause substantial, specified loss of waistline and thigh sizes in a brief period of time, without the need to exercise or diet, (3) defendants' weight loss and size reduction claims for Super–Formula have been scientifically validated in credible clinical studies: and (4) their product was endorsed by the president of a recognized organization of physicians specializing in nutrition. The defendants' misrepresentations constitute deceptive acts or practices in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a), and false advertisements in violation of § 12 of the FTC Act, 15 U.S.C. § 52.

### 1. *Weight Loss Claims*

Through advertisements and telephonic representations to consumers, defendants represented that users of Super–Formula would lose specified, substantial amounts of weight within brief, particularized periods of time, without dieting or exercise. These representations were false. To lose one pound of weight, according to a credible expert, the average individual needs a deficit of approximately 3,500 calories between caloric intake and caloric output. Although drugs may make it easier to achieve this deficit, they cannot alter this basic equation. Thus, it would be impossible for a person who did not diet or exercise to lose weight simply by taking the defendant's drug or weight loss product.

It is thus elementary that if a person consumed calories in excess of his/her daily needs, and did not diet or exercise there would be weight increase, rather than decrease.

Sarcone testified that the statements in SlimAmerica's advertisements regarding Super–Formula's ability to "blast" specific amounts of weight and body size inches off users' bodies was based on his own "life experience," rather than on results of valid studies regarding Super–Formula's ingredients.

Although the defendants produced eight consumer witnesses at trial who allegedly lost substantial amounts of weight while using Super–Formula, this anecdotal information does not constitute meaningful proof of their weight loss claims. None of the consumers produced records of their weight loss, and all but two testified that they made significant changes in their diet and exercise habits while using Super–Formula. Moreover, only one of the eight consumers claimed a weight loss of the magnitude advertised in the Super–Formula ads. Even if the testimony of the defendants' witnesses regarding weight loss are true to any extent, some could be explained as a placebo effect—a perceived reaction to an inactive substance, e.g. a "sugar pill", where a remedial effect is otherwise medically explainable.

### 2. *Size Reduction Claims*

Through advertisements and telephonic representations to consumers, the defendants represented that Super–Formula would cause substantial, specified loss of waistline and thigh sizes in a brief period of time, without the need to exercise or diet. These representations were false. Weight loss is required for changing waist or thigh circumferences. Not only is there no plausible scientific or medical evidence to support defendants' weight loss claims, according to the plaintiff's expert there is no plausible scientific or medical evidence supporting claims that diet products can

make size reductions exclusively from specific areas of the body.

### 3. Lack of Scientific Validation for Defendants' Weight Loss and Size Reduction Claims

Through their advertisements and telephonic representations to consumers, the defendants represented that their weight loss and body size reduction claims for Super–Formula had been scientifically validated in credible clinical studies. These representations were false. The vast majority of the materials purportedly relied on by defendants for support of their product efficacy claims, to the extent they purport to be studies, contain serious methodological and technical flaws, and therefore cannot be characterized as serious scientific research. Many of these materials involve animal and *in vitro* (test tube) studies, without medical proof that effects would be the same in humans.

Moreover, the materials relied on by the defendants for support of their product efficacy claims involve single ingredients of Super–Formula. Scientific validation of the defendants' product claims requires a double blind study of the combination of ingredients used in Super–Formula. This is so because ingredients taken in combination may interact in ways which negate the benefits of the same ingredients taken alone.

There is only evidence of one double blind study involving the combination of ingredients in Super–Formula. That study, conducted by a company known as Research Testing Laboratories, Inc. ("RTL"), was commissioned by the defendants in October 1996—more than a year after they began selling Super–Formula— and was incomplete at the time the Commission brought this case. The Court issued an order allocating money to complete the study pursuant to the defendants' requests. A report containing the findings of the study was completed on December 1, 1997.

The RTL study shows that the defendants' representations about Super–Formula were false. The study provides no support whatsoever for any of defendants' weight loss or size reduction claims. In fact, the study concluded there was no statistically significant difference in weight loss between subjects who took Super–Formula and those who took a placebo.

### Defendants' Offshore Bank Accounts

During a trip to the Bahamas in July 1996, Sarcone established an account at a firm known as Henry Ansbacher Ltd. ("Ansbacher"). The account was opened in the name of Varig, Ltd. ("Varig"). From at least July 1996 until December 31, 1996, Sarcone was the sole director of Varig and the sole signatory on its account at Ansbacher. Between July 1996 and December 31, 1996, Sarcone transferred at least $805,000 to his Varig account from SlimAmerica accounts at Northern Trust Bank in Florida.

At some point between November 1996 and January 1997, Sarcone transferred at least $100,000 from his Varig account to another account in the Turks and Caicos Islands. He received weekly statements from Ansbacher regarding his accounts after this case was filed and received such statements as recently as September 16, 1997. The September 16 statement reflected that Sarcone's funds in Varig amounted to $721,503. On March 5, 1997, Ansbacher had forwarded to Sarcone, in his capacity as "sole Director and beneficial owner of Varig Ltd." various court orders which had been served on Varig in an action brought by the Receiver.

With apparent disregard for this Court's preliminary injunction that the defendants deliver to the Receiver "[p]ossession and custody of all . . . bank records, including monthly statements, canceled checks, records of wire transfers, and check registers, of the receivership defendant", Sarcone admittedly "tossed" all of the subject materials without notice to the Receiver, who learned of their existence in October 1997 pursuant to discovery in a case brought against Sarcone in the Bahamas.

Sarcone testified that he turned over ownership and control of his Varig interests to an entity known as the "Clairview Group," through a letter dated December 31, 1996, and at the same time, signed over his stock certificates for Varig to Paul Dempsey, a Bahamian lawyer for the Clairview Group. Sarcone explained that the reason for the turnover of the Varig monies to Clairview was to repay a $200.000 "investment" that Clairview made to him, by authority of Larry Williams, during the startup period of SlimAmerica. Finally, Sarcone testified that all understandings regarding the Clairview and Varig transactions were oral and that he has no written contracts, memoranda, or any documents in support of his assertions.

This Court held in an order issued on April 8, 1997 which directed repatriation of overseas assets, that Sarcone's undocumented assertions regarding repayment of investors were not believable and that the transfer was "a fraudulent conveyance to avoid creditors." Having heard Sarcone's testimony at trial, particularly his admission that he received statements from Ansbacher for a period of at least eight months after he claims to have divested himself of all interest in his Varig account, all findings made in the April 8, 1997 order are adopted. The Court finds that Sarcone had ownership and control of the Varig accounts and if he has actually transferred these accounts, such transfer was fraudulent and in violation of orders of this Court.

Funds held in Bahamian accounts, in the name of the Varig or the Clairview Group, which on September 16, 1997 totalled $721,503, are the balance of the funds transferred from SlimAmerica accounts in Florida, after this action commenced.

### Injunctive Relief

This is a proper case for entry of a permanent injunction against the defendants under § 13(b) of the FTC Act, 15 U.S.C. § 53(b). If not enjoined, the defendants are likely to continue their deceptive practices in the future. An injunction against the individual defendants Sarcone and Wyman is appropriate because, as set forth in the findings of fact, those defendants master minded the deceptive acts set forth above or had considerable control over those acts. *FTC v. Atlantex Associates,* 1987 WL 20384, 1987–2 Trade Cas. (CCH) ¶ 67,788, at 59,254–55 (S.D.Fla. 1987), *aff'd* 872 F.2d 966 (11th Cir.1989); *FTC v. American Standard Credit Sys., Inc.,* 874 F.Supp. 1080, 1089 (C.D.Cal. 1994).

The Court has the discretion to model injunctive orders to fit the exigencies of the particular case, and the power to enjoin related unlawful acts that may be fairly anticipated from defendants' past conduct. *FTC v. Kitco of Nevada, Inc.,* 612 F.Supp. 1282, 1296 (D.Minn. 1985). "Broad injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise." *Wolf,* 1996 WL 812940, 1997–1 Trade Cas. (CCH) ¶ 71,713 at 79,081. The defendants' misrepresentations were not isolated occurrences, but pervaded the entire SlimAmerica marketing scheme. Moreover, defendant Sarcone has repeatedly engaged in fraudulent telemarketing and direct mail schemes despite cease and desist orders, injunctive provisions, and redress awards entered against him in Florida and other states.

### Redress

Section 13(b) of the FTC Act permits the Court to order consumer redress. To obtain consumer redress it is not necessary that the Commission show actual reliance by each individual consumer. Reliance may be inferred where the deceptive acts and practices were "the type of misrepresentation[s] on which a reasonably prudent person would rely, they were widely disseminated, and injured consumers who purchased [the product]." *FTC v. Security Rare Coin & Bullion Corp.* 931 F.2d 1312, 1316 (8th Cir.1991).

Representations made by the defendants were material and the type upon

which a reasonably prudent person would rely. Furthermore, the representations were widely disseminated. Finally, a great number of consumers actually purchased defendants' products. Consumer redress is therefore appropriate. The appropriate measure for redress is the aggregate amount paid by consumers, less refunds made by defendants. *Wolf,* 1997–1 Trade Cas. (CCH) ¶ 71,713 at 79,081; *FTC v. Pacific Medical Clinics Management,* 1992–1 Trade Cas. (CCH) ¶ 69,777 at 67,588 (S.D.Cal.1992). Here, the defendants' own documents show that they made sales of $9,523,943.61 and refunds of $1,149,356.90. Judgment for monetary relief in the amount of $8,374,586 is therefore appropriate. Costs incurred by the defendants in the creation and perpetration of the fraudulent scheme will not be passed on to the victims.

■ An individual is obligated to make consumer redress for violations of the FTC Act where he (1) participated in or had the authority to control the wrongful acts or practices; and (2) had some knowledge of the wrongful acts or practices. *FTC v. Gem Merchandising Corp.,* 87 F.3d 466, 470 (11th Cir.1996). To satisfy the knowledge requirement, the Commission does not need to demonstrate that the individual defendants possessed the intent to defraud, nor that the defendants had actual knowledge of the misrepresentations. *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir.1989). "Reckless indifference to the truth or falsity of the representations or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth will suffice. Moreover, a defendant's participation in corporation affairs is probative of knowledge." *Id.*

■ Sarcone and Wyman had actual knowledge of the material misrepresentations, were recklessly indifferent to the truth or falsity of such misrepresentations, or were aware of the high probability of fraud and intentionally avoided the truth. "Given the importance of the misrepresentations and the level of the individual defendants' participation, they either knew or should have known that misrepresentations were made." *Wolf,* 1997–1 Trade Cas. (CCH) ¶ 71,713, at 79,081. SlimAmerica, Sarcone and Wyman are therefore jointly and severally liable for consumer damages.

### Ancillary Equitable Relief

■ Additional ancillary equitable relief is necessary to protect consumers and ensure that the defendants do not perpetrate new frauds. In particular, the Court concludes that a performance bond requirement is an appropriate remedy to protect consumers and prevent defendants from engaging in further deceptive practices. *Wolf,* 1997–1 Trade Cas. (CCH) ¶ 71,713, at 79,081; *FTC v. Career Assistance Planning,* 1996 WL 929696, 1997 U.S.Dist. Lexis 17191, *10 (N.D.Ga.1996); *FTC v. U.S. Sales Corp.* 785 F.Supp. 737, 753 (N.D.Ill.1992). Defendant Sarcone has continued to engage in fraudulent weight-loss, telemarketing, and direct mail marketing schemes with contempt for cease and desist orders, injunctive provisions, and redress awards entered against him. He owes at least $2.43 million in court-ordered restitution for past frauds.

Defendant Wyman was an active participant in the fraudulent practices in this case. He also concealed funds received in connection with the Renew Skin Care telemarketing and direct mail scheme in violation of this Court's July 2, 1997 preliminary injunction order, and concealed his and Sarcone's involvement in this scheme when questioned under oath. Accordingly, to protect consumers and prevent future violations, he is required to post a performance bond before engaging in any business related to weight-loss specifically, or telemarketing generally.

Record-keeping and monitoring provisions in the permanent injunction are also appropriate to permit the Commission to police the defendants' compliance with the order. Finally, the appointment of a receiver to wind up affairs is appropriate

where, as here, " 'those who have inflicted serious detriment in the past must be ousted.' " *See Wolf,* 1997–1 Trade Cas. (CCH) ¶ 71,713, at 79,081 (*quoting SEC v. R.J. Allen & Assocs., Inc.,* 386 F.Supp. 866, 878 (S.D.Fla.1974)). Accordingly, it is

**ORDERED AND ADJUDGED** that the preliminary injunction entered in this cause on July 2, 1997 is hereby made permanent.

It is further **ORDERED AND ADJUDGED:**

(a) the defendant Sarcone shall post a performance bond in the amount of $5 million before engaging, directly or indirectly, in any business related to weight-loss products or services specifically, or in marketing of any product or services generally, anywhere in the United States.

(b) the defendant Wyman shall post a performance bond in the amount of $1 million before engaging, directly or indirectly, in any business related to weight loss products or services specifically, or in marketing of any product or services generally, anywhere in the United States.

(c) the transfer of funds to a Bahamian bank account is hereby declared void and the Receiver shall proceed with all necessary legal and diplomatic[7] measures necessary to effectuate a repatriation of these assets. Any conduct of the individual defendants undertaken to frustrate this provision or any other provision of the judgment shall be treated as acts of contempt.

(d) the defendants, jointly and severally, shall pay the plaintiffs $8,374,586 for consumer redress and costs of this action.

(e) the receiver for SlimAmerica, Thomas Tew, is hereby granted full authority of a liquidating receiver with complete authority to marshal and

dispose of assets as ordered by the Court.

---

**7.** According to counsel for one of the parties, a Bahamian judicial officer, on his own, and in open court, raised a question as to this Court's "credentials". The inquiry was indeed unusual. No opinion is offered here on how to proceed if the concern becomes an impediment to the Receiver's efforts.