846 A.2d 433

**BALTIMORE COUNTY, Maryland**

v.

**RTKL ASSOCIATES INC., et al.**

**No. 77, Sept. Term, 2003.**

Court of Appeals of Maryland.

April 9, 2004.

Reconsideration Denied May 6, 2004.

Jeffrey Grant Cook, Assistant County Attorney (Edward J. Gilliss, County Attorney of Towson, on the brief), for appellant/cross–appellee.

John A. King (Brett A. Pisciotta of King & Attridge of Rockville, on the brief), for appellees/cross–appellants.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

WILNER, J.

Two issues are before us in this appeal: (1) what, if any, statute of limitations applies to an action filed by a county for breach of a written contract; and (2) whether a plaintiff who sues a corporate engineering or architectural firm for breach of contract or negligence is required to file a certificate of merit pursuant to Maryland Code, § 3–2C–02 of the Cts. & Jud. Proc. Article (CJP). We shall hold that the three-year statute of limitations set forth in CJP § 5–101, applicable generally to civil actions, applies to the county's action, and that the certificate of merit requirement of CJP § 3–2C–02 is limited to actions against licensed individuals and is not applicable to suits against corporate firms. The result of these holdings will be a reversal of the judgment entered by the Circuit Court for Baltimore County.

## BACKGROUND

In April, 1996, Baltimore County and RTKL Associates, Inc. (RTKL) entered into a written contract under which RTKL agreed to provide design development, construction documents, and bid assistance for Phase I of the Dundee–Saltpeter Environmental Park, a proposed education center to be located in the northeastern part of the county. At some point, RTKL engaged Andrews, Miller & Associates (AMA) as a subcontractor to "perform engineering services associated

with the grading of the property." Although the record is not entirely clear on this point, it appears that work under the contract was completed in 1998. In June, 1999, a county survey crew discovered that "benchmarks set by AMA were off by .092 feet" and that "all grading of dirt was done .092 feet too low." As a result, more dirt had to be brought to the site to correct the grading and foundation walls already installed had to be changed. That, in turn, required the "disassembly of wall panels, additional concrete and changes to the slab of the grade."

In August, 2001, the county sued both contractors, charging them with breach of contract and negligence. The defendants initially moved to dismiss the action on two grounds—that the dispute was subject to arbitration and that the action was not filed within the one-year time period allowed by Maryland Code, Art. 25A, § 1A(c). The motion to dismiss in favor of arbitration was accompanied by a petition to compel arbitration.

The court denied that petition and the motion to dismiss in favor of arbitration but did not expressly rule on the limitations issue. RTKL and AMA filed an interlocutory appeal, asking the Court of Special Appeals to rule on both issues. The appellate court declined that invitation. Holding that an immediate appeal was permissible from an order denying a petition to compel arbitration, the court considered the defendants' argument on that issue, but, finding no merit in it, affirmed the ruling of the Circuit Court. Concluding that no interlocutory appeal lay from any implied ruling on the limitations issue, however, the court refused to consider that matter. *RTKL v. Baltimore County*, 147 Md.App. 647, 810 A.2d 512 (2002).

When the case returned to the Circuit Court, RTKL and AMA filed joint motions to dismiss on the grounds of the one-year statute of limitations in Art. 25A, § 1A(c) and the county's failure to file a certificate of merit in accordance with CJP § 3–2C–02. The county argued in response to the limitations argument that Art. 25A, § 1A(c) applied only to persons suing

a county on a written contract, not to the situation where the county was the plaintiff, and that, indeed, the county was not subject to *any* statute of limitations when acting as a plaintiff in a breach of contract action. In May, 2003, the court denied the motion founded on the lack of a certificate of merit, holding that the requirement applied only to suits against licensed professionals—individuals—and not to suits against corporations. It granted the motion based on limitations, however, concluding, largely on the ground of parity, that the one-year statute should apply to both parties to the contract, and not just one of them. Both sides appealed, and we granted *certiorari* on our own initiative, before proceedings in the Court of Special Appeals, to consider the two issues.

## DISCUSSION

### *Statute of Limitations*

### Art. 25A, § 1A(c)

CJP § 5–101 provides that "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Everyone agrees that the county's action was filed within that three year period, but neither side believes that § 5–101 is the applicable provision. The defendants contend that the applicable statute of limitations is the one-year provision contained in Art. 25A, § 1A(c). The county, asserting the ancient common law doctrine of *nullum tempus occurrit regi* (time does not run against the King), argues that, when acting as a plaintiff, it is not subject to *any* statute of limitations. We shall begin with the statute.

Art. 25A, § 1A was part of a law first enacted in 1976 (1976 Md. Laws, ch. 450) that, subject to certain conditions and limitations, waived the sovereign immunity of the State and purported to waive sovereign immunity of the counties and municipalities of the State in actions against them for breach of a written contract. Until the enactment of that law, the State and its agencies enjoyed a common law sovereign immu-

nity from suits in both contract and tort: "neither a contract nor a tort action [could] be maintained against the State unless specific legislative consent has been given and funds (or the means to raise them) are available to satisfy the judgment." *Dep't of Natural Resources v. Welsh,* 308 Md. 54, 58–59, 521 A.2d 313, 315 (1986).

Although the immunity enjoyed by the State, in both contract and tort actions, was a general one that had long been recognized, we noted in *American Structures v. City of Balto.,* 278 Md. 356, 359, 364 A.2d 55, 57 (1976), that "[a]s regards counties and municipalities, however, the rule is different." Municipalities and counties enjoyed a limited immunity in tort actions. As we confirmed in *DiPino v. Davis,* 354 Md. 18, 47, 729 A.2d 354, 369–70 (1999), "[a] local governmental entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity." We recounted in *American Structures,* however, that counties and municipalities "have been regularly subject to suit in *contract* actions, whether the contracts were made in performance of a governmental or proprietary function, as long as the execution of the contract was within the power of the governmental unit." *Id.* at 359–60, 364 A.2d at 57, citing cases dating back to 1862 (Emphasis added). In *Montgomery County v. Revere,* 341 Md. 366, 671 A.2d 1 (1996), we confirmed that "under Maryland law counties and municipalities are normally bound by their contracts to the same extent as private entities" and that "Maryland law has never recognized the defense of governmental immunity in contract actions against counties and municipalities." *Id.* at 384, 671 A.2d at 10. *See also Harford Co. v. Bel Air,* 348 Md. 363, 372, 704 A.2d 421, 425 (1998); *Fraternal Order of Police v. Balto. Co.,* 340 Md. 157, 173, 665 A.2d 1029, 1037 (1995).

That distinction—that the immunity from contract actions enjoyed by the State did not apply to the counties and municipalities—appears to have been missed by the General Assembly when it enacted ch. 450 in 1976, for, in one of the

"Whereas" clauses that introduced the bill, the Legislature stated that this Court had held that, "as a result of the common law doctrine of sovereign immunity, a suit cannot be maintained against the State *or its political subdivisions,* unless authorized by the Legislature, and funds are available to satisfy any judgment rendered." (Emphasis added). Under that assumption, and desiring to modify the effect of this common law doctrine in the belief that "there exists a moral obligation on the part of any contracting party, including the State or its political subdivisions, to fulfill the obligations of a contract," the Legislature proceeded, subject to certain conditions and limitations, to waive the immunity it knew was enjoyed by the State and the immunity it apparently thought was enjoyed by the counties and municipalities in actions for breach of a written contract.

The Legislature achieved that result by enacting, in the one bill, five sets of nearly identical provisions: one, now found in §§ 12–201 through 12–204 of the State Government Article, applicable to actions against the State or units of the State government; a second, codified in Art. 23A, § 1A, applicable to actions against incorporated municipalities; a third, codified in Art. 25, § 1A, applicable to actions against non-chartered, non-code counties; a fourth, codified in Art. 25A, § 1A, applicable to actions against chartered counties, such as Baltimore County; and the fifth, codified in Art. 25B, § 13A, applicable to actions against code counties.

Each set contained four subsections. The most relevant set here—Art. 25A, § 1A—began in subsection (a) with the statement that, unless otherwise specifically provided by the Laws of Maryland, neither a chartered county nor its units or officials could raise the defense of sovereign immunity in the courts of this State in an action based on a written contract executed on behalf of the county or a unit of the county by an official or employee acting within the scope of his/her authority. Subsection (b) provided that, in any such action, neither the county nor its units or officials were liable for punitive damages. That, too, was unnecessary, as this Court had made clear well before 1976 and has consistently maintained since

then, that punitive damages are not recoverable by anyone in a breach of contract action. *See St. Paul at Chase v. Mfrs. Life Insur.*, 262 Md. 192, 236, 278 A.2d 12, 33, *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971); *Siegman v. Equitable Trust Co.*, 267 Md. 309, 313, 297 A.2d 758, 760 (1972) ("It is well settled in this State that there can be no award of punitive damages in a pure action for breach of contract."); *Bowden v. Caldor*, 350 Md. 4, 22, 710 A.2d 267, 276 (1998) ("Under Maryland law, punitive damages are allowable only in tort actions.").

Subsection (c), which is the one at issue here, provides that "[a] claim is barred unless the claimant files suit within one year from the date on which the claim arose or within one year after completion of the contract giving rise to the claim, whichever is later." Subsection (d), intending to address one of the practical supports for the sovereign immunity defense, requires the county, "[i]n order to provide for the implementation of this section," to "make available adequate funds for the satisfaction of any final judgment ... which has been rendered against the county ... in an action in contract as provided in this section." The remaining subsections, added after 1976, place certain conditions and limitations on mandated alternative dispute resolution provisions in construction contracts; they are not presently at issue in this case.

The defendants contend, and the Circuit Court found, that the words "claim" and "claimant," as used in subsection (c), include the county when it seeks recovery as a plaintiff, and that, as a result, the county in this case is subject to the one-year statute of limitations. The county, of course, reads those words as applying only to those who sue the county.[1]

---

1. The issue of whether Art. 25A, § 1A(c) and its counterparts applicable to actions against the State and other political subdivisions of the State are true statutes of limitations or conditions on the right to sue has not been raised in this case and is not relevant to this case. That issue is before us in another case. We refer to those provisions as statutes of limitations for convenience and because the parties have done so.

■■■ The issue is one of statutory construction, and, as we have often said, our predominant goal, when construing statutes, is to ascertain and implement the legislative intent. *See MVA v. Lytle,* 374 Md. 37, 57, 821 A.2d 62, 74 (2003); *Toler v. MVA,* 373 Md. 214, 220, 817 A.2d 229, 233 (2003). In doing so, we look first to the words of the statute, but if the true legislative intent cannot readily be determined from the statutory language alone, we look to other indicia of that intent, including the title to the bill, the structure of the statute, the inter-relationship of its various provisions, its legislative history, its general purpose, and the relative rationality and legal effect of various competing constructions. *Id. See also Witte v. Azarian,* 369 Md. 518, 525, 801 A.2d 160, 165 (2002).

The language of subsection (c), if read in isolation and divorced from the rest of the section, is, indeed, ambiguous. As a stand-alone statute, it could be read, on its face, to apply to *any* claim, by *any* person, on *any* contract, including those between private persons, and thus to replace entirely, as to breach of contract actions, the three-year statute of limitations in CJP § 5–101. There is no suggestion anywhere that *that* could have been the legislative intent. The subsection can take its proper meaning only by reference to other relevant indicia of legislative intent, the clearest and most pertinent evidence of which lies in the other provisions of the statute and in the title to the Act, in which the subject of the Act is required to be described. *See* Maryland Constitution, Art. III, § 29.

The title to ch. 450 states that it is for the purpose of providing that the State and its counties and municipalities "may not raise the defense of sovereign immunity in the courts of this State in an action in contract based upon certain written contracts" and "setting forth certain exclusions and limitations *applicable to such actions* ..." (Emphasis added). The only situation in which sovereign immunity could be raised as a "defense" is when a claim is being made *against* the governmental entity; sovereign immunity as a defense has no meaning in the context of a claim *by* a governmental entity against someone else. Thus, the title alone, which necessarily

limits the scope of the statute, makes clear that the limitations applicable to "such actions" must mean actions *against* the governmental entity.

That meaning flows indisputably from the other provisions of the statute itself. For the reasons noted, subsection (a), precluding the governmental entities from raising of the defense, can apply only to claims against the entity. Subsection (b), stating that "[i]n any such action" the entity is not liable for punitive damages, also can apply only to claims *against* the entity; even if the law otherwise allowed punitive damages in a breach of contract action, the entity obviously could not be subject to liability for such damages when it is the claimant. Similarly, subsection (d), requiring the county, "[i]n order to provide for the implementation of this section," to provide funds for the satisfaction of any final judgment "which has been rendered against the county" can have reference only to actions against the county. The requirement would be unnecessary when the county is acting as a claimant and thus would not be needed in that situation to provide for the implementation "of this section."

The whole structure of the statute—its text and its title— militates against the construction urged by the defendants and adopted by the Circuit Court. So, indeed, does its legislative history.

That history begins, for our purposes, with House Joint Resolution 65, adopted by the General Assembly in 1968. *See* 1968 Md. Laws, Joint Resolution No. 49. In that Joint Resolution, the Legislature expressed the view that "[t]he present judicial doctrine of sovereign immunity often operates capriciously and unjustly to preclude recovery on many meritorious claims against state and local governments" and noted the then-recent holding of this Court in *Weisner v. Bd. of Education*, 237 Md. 391, 206 A.2d 560 (1965) that the doctrine was so firmly established in Maryland law that any change would have to come from the Legislature.

The clear focus of the Joint Resolution was on immunity in tort actions, which was the subject of the *Weisner* case. The

resolution called attention to the recent adoption of a Tort Claims Act in California and stated that "[t]he delineation of those areas where justice dictates that state and local governments be liable in tort and be responsible for providing compensation to injured persons can best be accomplished through detailed legislation in the nature of a State Tort Claims Act." It continued that the liability of the State and its officers "in tort" required a comprehensive study, and, to that end, requested the Governor to appoint a Commission to make a comprehensive study on "the extent to which state and local governments and their officers should be liable *in tort* and on how best to insure that funds are available to . . . meet such claims."

Such a Commission was appointed, but due, apparently, to a lack of funding, it never conducted the study or issued a report. In 1969, the Legislative Council considered the matter, but took no action. *See* Minutes of Judiciary Committee of Legislative Council, Meeting of May 6–7, 1969, Item 64. A proposed Constitutional Amendment (Senate Bill 651), to provide that sovereign immunity could not be pleaded as a defense in a suit against the State or any unit of local government except to the extent prescribed by law, was introduced into the 1969 session of the General Assembly, but did not pass.

The Legislative Council considered the issue again in 1972 in connection with its study of a State insurance program. *See* Maryland Legislative Council Senate Finance Committee, House Committee on Appropriations, House Committee on Ways and Means, Joint Budget Subcommittees 1972 Report, Item 266 (Study of State Insurance Program and Self–Insurance Alternatives). The Council noted that, although sovereign immunity was generally available, legislative exceptions had been made to that doctrine and a number of State and local agencies had obtained comprehensive insurance or had established self-insurance programs. The Council expressed the view that, the State, "having made the basic decision to waive sovereign immunity in some cases, should make the waiver uniform in all cases by legislative act." *Id.* at 101.

In 1973, House Bill 1119 was introduced to make the State, the counties, and the municipalities liable "in any action of contract" and to preclude them from raising the sovereign immunity defense in those actions. The bill passed the House of Delegates but died in the Senate. A similar bill (House Bill 5) did pass in the 1974 session but was vetoed by the Governor, who expressed a number of concerns, including the lack of any provision for making funds available to pay any judgments and whether, as worded, it might include actions sounding in negligence that arose from contracts or from governmental services that might be construed as contractual in nature. The Governor expressed the belief that further study was necessary and committed himself to reconstituting the Commission created in 1968. *See* Veto Message of Governor, May 31, 1974, 1974 Md. Laws at 3087–89.

Deciding not to await a report from that Commission, the Legislature enacted House Bill 1672 in 1975, which again would have made the State and its political subdivisions liable in an action of contract and preclude them from raising sovereign immunity in such actions. In an attempt to address one of the Governor's concerns, the bill required the Governor to include in the State budget adequate funds for the satisfaction of any judgment rendered against the State and required the governing bodies of the political subdivisions to "make available" adequate funds for the payment of such judgments. That bill, too, was vetoed. The Governor noted that, although the bill required the Governor to include funds in the budget to satisfy judgments, it did not preclude the General Assembly from cutting or eliminating those funds and thus still left the matter uncertain. He again expressed his desire that the Legislature await a report from the Commission. *See* Veto Message of Governor, May 15, 1975, 1975 Md. Laws at 4067–69.

As part of its investigation into the waiver of immunity in contract claims, the Commission prepared a questionnaire, which it sent to bar associations and a variety of other interested organizations. Among the questions asked was whether there should be "a special statute of limitations for

contract claims *against* the State or other sovereign?" (Emphasis added). In a December, 1975, response, the Maryland State Bar Association Committee on Claims Against the State, in a letter to the Chairman of the Commission, advised that, in principle, it favored allowance of actions against the government on written contracts, "if preceded by fulfillment of a notice requirement and if within a prescribed special period of limitations."

In an interim report to the Governor in February, 1976, the Commission recommended that sovereign immunity be waived in contract actions, subject to certain conditions and limitations. In that regard, the Commission noted that responses from other States indicated that abrogation of sovereign immunity in contract actions had produced negligible fiscal impact, because (1) the State had already appropriated the money needed to fulfill the contractual obligation, (2) the contract itself could provide conditions to liability, and (3) "when the states abrogate sovereign immunity, they do so subject to a number of exceptions and limitations which act to further minimize the fiscal impact." The bill that became ch. 450, introduced immediately on the heels of the Commission's interim report, made specific reference to that report.

There is nothing in this legislative history even to suggest an intent to shorten the statute of limitations applicable to an action *by* the State or one of its political subdivisions for breach of contract. The only concern—on the part of the Governor, who had vetoed two earlier bills, on the part of the State Bar Association, and on the part of the Commission— was a mechanism to limit the exposure of governmental units in actions *against* them. Along with the preclusion of punitive damages and making the waiver applicable only to written contracts, the special statute of limitations applicable to claims against the governmental entities was inserted to address that concern. For all of these reasons, we hold that Art. 25A, § 1A(c), and its counterparts applicable to the other governmental entities, applies only to claims *against* the entity.

### Nullum Tempus

■ We turn now to the county's contention that it is clothed with the mantle of *nullum tempus occurrit regi* (or, as one author suggested may be more appropriate in our republican form of government, *nullum tempus occurrit reipublicae* )[2] and is subject to no statute of limitations when acting as a plaintiff. We reject that approach in breach of contract actions brought by counties and municipalities and, because those issues are not now before us, reserve on whether we should continue to recognize it in actions brought by the State or its agencies or in tort actions brought by counties and municipalities.

The doctrine that statutes of limitations and laches do not run against the Sovereign lies deep in English common law, having been traced back even to the time of Bracton in the 13th Century. *See United States v. Hoar*, 26 F.Cas. 329 (C.C.D.Mass.1821); *United States v. Thompson*, 98 U.S. 486, 489, 25 L.Ed. 194, 195 (1879); Joseph Chitty, A TREATISE ON THE LAW OF THE PREROGATIVES OF THE CROWN 379 (1820). Several somewhat related rationales have been asserted for the doctrine, at least in its English formulation. Blackstone tied it not only to the sovereignty of the King but to the legal (though hardly justifiable) notion of his "absolute perfection." 1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND *246 (Lewis Ed.1902). Blackstone observed:

"Besides the attribute of sovereignty, the law also ascribes to the king, in his political capacity, absolute *perfection*. The king can do no wrong: which ancient and fundamental maxim is not to be understood, as if every thing transacted by the government was of course just and lawful, but means only two things. First, that whatever is exceptionable in the conduct of public affairs, is not to be imputed to the king, nor is he answerable for it personally to his people; for this doctrine would totally destroy that constitutional

---

**2.** *See* Sigmund D. Schutz, *Time to Reconsider Nullum Tempus Occurrit Regi—The Applicability of Statutes of Limitations Against the State of Maine in Civil Actions,* 55 Me. L.Rev. 373, 375 (2003).

independence of the crown, which is necessary for the balance of power in our free and active, and therefore compounded, constitution. And, secondly, it means that the prerogative of the crown extends not to any injury: it is created for the benefit of the people, and therefore cannot be exerted to their prejudice." [3]

Blackstone continued that "[i]n further pursuance of this principle, the law also determines that in the king can be no negligence, or *laches,* and therefore no delay will bar his right." *Id.* at 247. Thus, *"[n]ullum tempus occurrit regi* has been the standing maxim upon all occasions; for the law intends that the king is always busied for the public good, and therefore has no leisure to assert his right within the times limited to subjects." *Id. See also* 4 Matthew Bacon, A NEW ABRIDGMENT OF THE LAW, 6th ed. at 200–01 (1793). Chitty adds, as an additional rationale, that "the King should [not] suffer by the negligence of his officers, or by their compacts or combination with the adverse party." Chitty, *supra,* at 379.

After the American Revolution, the States, and ultimately the Federal Government, adopted the common law doctrine as an incident of their new, transferred sovereignty. *See United States v. Thompson, supra,* 98 U.S. 486, 489–90, 25 L.Ed. 194,

---

**3.** Blackstone adds that "[t]he king, moreover, is not only incapable of *doing* wrong, but even of *thinking* wrong: he can never mean to do an improper thing: in him is no folly or weakness." *Id.* Perhaps the most apt response to this entire fiction of royal infallibility came from the humorist A.P. Herbert who, through the opinion of the Lord Chancellor in the fictional case of *Bold v. The Attorney General,* noted: "One of the first actions of a loyal young Englishman who begins to study the law of the land is to read carefully the pages which are concerned with the King; and he learns with some surprise ... that the King can do no wrong. He is surprised for this reason; that the whole course of his historical studies at school has led him to believe that at the material dates of English history the King was always doing wrong ... It is not too much to say that the whole Constitution has been erected upon the assumption that the King not only is capable of doing wrong but is more likely to do wrong than other men if he is given the chance." *See* A.P. Herbert, UNCOMMON LAW, *Bold v. The Attorney General,* at 292 (1977 ed.). The power to remove the President and the Governor through the Constitutional impeachment process necessarily belies any notion that they are incapable of doing wrong. *See Langford v. United States,* 101 U.S. 341, 343, 25 L.Ed. 1010, 1011 (1879).

195; *Colorado Springs v. Timberlane Assoc.*, 824 P.2d 776, 778 (Colo.1992). Most States continue to recognize the doctrine to some extent and in some fashion, no longer, of course, as a royal prerogative but as a matter of public policy, "to preserv[e] the public rights, revenues, and property from injury and loss, by the negligence of public officers." *Guaranty Trust Co. of New York v. United States*, 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224, 1228 (1938).

Maryland seems to have gone both ways on whether the doctrine applied in this State. In three early cases, this Court held that the *nullum tempus* doctrine was personal to the King, that it had not been transferred to the Proprietor of the Maryland colony, and that the Proprietor was therefore bound by statutes of limitations. *See Lord Proprietary v. Bond*, 1 H. & McH. 210 (1760) (Proprietary barred by limitations in suit on sheriff's bond). In *Kelly's Lessee v. Greenfield*, 2 H. & McH. 121, 138 (1785), the Court expounded even more directly:

> "[T]he maxim, '*nullum tempus occurrit regi*,' has never been applied, that we can find, to any but the king himself ... It never was in the Proprietor ... and there could have been no very good pretext for the Judges to adopt it here, because he *never busied himself* extremely in the affairs of *Maryland*, which was the ground of its being *at first* established in the case of the king; *i.e.*, his constant attention to the public weal and the public concerns, to the neglect of his private affairs. Besides, it is an unjust, injurious and inconvenient rule, with respect to the citizens, and as such not being expressly given, it ought not to be permitted to operate."

*See also Russell's Lessee v. Baker*, 1 H. & J. 71 (1800).

In *Swearingen v. United States*, 11 G. & J. 373 (1841), the Court took a different position. The question was whether, in a suit in State court, the United States was subject to the State 12–year statute of limitations for specialties. The case could, of course, have been easily decided on the basis of independent Federal sovereignty and supremacy, but the

Court decided to take a different approach. Without mentioning the three earlier cases, the Court concluded that the State succeeded to the sovereignty of the King and that "[t]o all claims springing out of the exercise of every sovereign power by the State, and which were due to the State, by express legislation, the doctrine of *nullum tempus*, & c., was applied ..." [4] Having afforded the State this exemption from limitations, the Court added that, when portions of that sovereign power were conferred on the United States, presumably through the adoption of the Federal Constitution, it assumed that privilege as well.[5] In *Am. Bonding Co. v. National Mechanics' Bank*, 97 Md. 598, 55 A. 395 (1903), this Court extended that view to hold that a surety, which had paid a judgment owing to the State and thereafter sued a debtor as subrogee of the State, "is entitled to stand in the State's position in reference to its claim against the appellee and enjoy its exemption from the operation of the Statute of Limitations." *Id.* at 607, 55 A. at 398.

In *Goldberg v. Howard Co. Welfare Bd.*, 260 Md. 351, 272 A.2d 397 (1971), we addressed for the first time the extent to which this doctrine applied to a county agency. A county welfare board had paid benefits to a man whose wife owned a piece of real property. When the wife died, he inherited the property and eventually sold it, taking back a purchase money deed of trust. At some point, the county welfare board sued the trustees under the deed of trust to recoup the benefits it

---

**4.** Although the Court made no effort to distinguish the three earlier cases, an implicit distinction does exist. The earlier cases were based on the view that the *nullum tempus* doctrine was personal to the King and had not devolved on the Proprietor through the Charter granted by the King. In *Swearingen,* the Court held that the State, upon Independence, assumed the sovereignty of the King, with which came the *nullum tempus* doctrine.

**5.** That approach seemed to assume that the Federal Government derived its powers by grant from the States, rather than through direct delegation by the People, a position that, as early as 1819, had been rejected by the Supreme Court. *See M'Culloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 402–05, 4 L.Ed. 579, 600–01 (1819). *See also U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 821–22, 115 S.Ct. 1842, 1863–64, 131 L.Ed.2d 881, 911–12 (1995).

had paid, and the trustees raised limitations as a defense. Without ever citing the three old cases, or even *Swearingen* or *Am. Bonding Co.*, and relying on unquoted statements in 53 C.J.S., *Limitations of Actions*, § 17c., this Court rejected that defense and held "when [an] action brought by a governmental agency or political subdivision or municipality has arisen out of its exercise of a strictly governmental function, such as rendering assistance to the aged, infirm, indigent and mentally incompetent, that the defense of limitations will not prevail against it." *Id.* at 358, 272 A.2d at 400–01.

In *Central Coll. Unit v. Atl. Con. Line*, 277 Md. 626, 627, 356 A.2d 555, 556 (1976), the Court addressed the issue of "whether the doctrine of sovereign immunity precludes a defendant's assertion of limitations as a defense to an action brought by the State in its sovereign capacity." The action was to recover for damage done to State property. In rejecting a limitations defense, the Court relied on *Am. Bonding Co.* for the proposition that "limitations may not be asserted against the State when, in its sovereign capacity, it sues in its own courts." *Central Coll. Unit*, at 628, 356 A.2d at 557. That view has become the modern standard. In *Wash. Sub. San. Comm'n v. Pride Homes*, 291 Md. 537, 544, 435 A.2d 796, 801 (1981), we iterated that "the doctrine that limitations do not run against the State stems from the theory of sovereign immunity."

*Goldberg* limited the application of that doctrine to the counties by subjecting it to the governmental/proprietary function test. That distinction was confirmed, with respect to *tort* actions, in *Anne Arundel County v. McCormick*, 323 Md. 688, 594 A.2d 1138 (1991). A county employee was injured in an automobile accident during the course of his employment. The county paid workers' compensation benefits and then, as subrogee of the employee, sued the person allegedly at fault in the accident, who raised limitations as a defense. The Court credited that defense on the ground that, as the county was suing as a subrogee, it was subject to all defenses applicable against the employee, including limitations. That could have ended the matter, but the Court went on to discuss *nullum*

*tempus.* Though confirming that the doctrine exempts the State and its agencies "from the bar of a statute of limitations such as § 5–101 of the Courts and Judicial Proceedings Article," the Court, citing *Central Coll. Unit* and *Goldberg,* noted that the doctrine "has more limited effect when the suitor is one of the State's political subdivisions or municipalities." *Anne Arundel County,* 323 Md. at 695, 594 A.2d at 1141. The counties and municipalities, we repeated, "can only avoid the bar of such a statute of limitations if the action asserted arises from the exercise of a governmental as distinguished from a proprietary or corporate function." *Id.*

Neither *Goldberg* nor *Anne Arundel County* involved a breach of contract action. Indeed, this Court has yet to consider whether the counties and municipalities enjoy or have ever enjoyed the benefit of *nullum tempus* in a contract action. It is an open question, which we now answer in the negative.

One thing that is clear, at least in Maryland, is that the *nullum tempus* doctrine is an aspect of the more general sovereign immunity enjoyed by the King of England and, after Independence, by the State. The *Central Coll. Unit* case established that it was "the doctrine of sovereign immunity" that precluded the assertion of limitations against the State in a contract action. *Central Coll. Unit, supra,* 277 Md. at 628, 356 A.2d at 556–57. *See also Wash. Sub. San. Comm'n v. Pride Homes, supra,* 291 Md. at 544, 435 A.2d at 801 ("[T]he doctrine that limitations do not run against the State stems from the theory of sovereign immunity."). The counties and municipalities, we have made clear, do not enjoy common law sovereign immunity in contract cases, and, to the extent there ever could have been any doubt about it, ch. 450 erases that doubt, at least as to authorized written contracts. The entire underpinning of *nullum tempus* is therefore absent with respect to the counties and municipalities in contract actions.

Although we shall not in this case disturb the governmental/proprietary function test applied with respect to non-contract actions, we find no good basis to extend that test to

contract actions. Many of the decisions regarding whether a function is governmental or proprietary in nature are confusing and almost impossible to reconcile. *See Baltimore v. State,* 168 Md. 619, 625, 179 A. 169, 171 (1935) ("[T]he line of demarcation between private, corporate, and ministerial, and governmental, political, and discretionary activities or functions of municipalities is difficult to discern, and more difficult to define."); *E. Eyring & Sons Co. v. City of Baltimore,* 253 Md. 380, 382, 252 A.2d 824, 825 (1969) ("[T]he distinction between governmental and proprietary functions is sometimes illusory in practice."); *also Austin v. City of Baltimore,* 286 Md. 51, 58–59, 405 A.2d 255, 259 (1979). We will not impose that mish-mash regime on contract actions.[6]

Accordingly, we hold that the county does not enjoy the benefit of *nullum tempus,* and that its action for breach of contract is governed by the three-year statute of limitations set forth in CJP § 5–101. As the action was undisputedly filed within that period, the Circuit Court erred in dismissing the action.

### Certificate of Merit

■ CJP § 3–2C–02, read in conjunction with § 3–2C–01, requires that a claim filed in Circuit Court against a "licensed professional" that is "based on the licensed professional's alleged negligent act or omission in rendering professional services, within the scope of the professional's license" be dismissed unless, within 90 days after the claim is filed, the claimant files a certificate from a qualified expert attesting that the licensed professional failed to meet an applicable standard of professional care.

RTKL and AMA contend that those sections apply to the action against them and that, as the county neglected to file the required certificate, its action should have been dismissed. They rely largely on an unpublished decision of the U.S.

---

6. It is not at all clear, even if we *did* apply a governmental/proprietary function test, that the contract at issue here would fall within the governmental function category.

District Court for the District of Maryland concluding that the statute applies to an action against a partnership of architects. *See Ferrell v. American Property Const. Co.,* Unpublished Memorandum Opinion, Civil Action No. WMN–02–1131 (D.Md.2003). With great respect for our Federal colleague, the author of that memorandum opinion, we disagree. Indeed, in a published opinion, another judge of the District Court concluded that the requirement did not apply to actions against a professional association. *See Adams v. NVR Homes, Inc.,* 135 F.Supp.2d 675, 716 (D.Md.2001).

The requirement, as noted, applies only to an action for professional malpractice against a "licensed professional." Section 3–2C–01(c) defines a "licensed professional," for our purposes, as "[a]n architect licensed under Title 3 of the Business Occupations and Professions Article" and "[a] professional engineer licensed under Title 14 of the Business Occupations and Professions Article." Section 3–303(a) of the Business Occupations Article makes clear that only an individual may be licensed as an architect. ("[T]o qualify for a license, an applicant shall be an individual who meets the requirements of this section."). Section 14–304(a) contains the same requirement for licensure as a professional engineer. The restriction is a necessary one, as both laws require, as a qualification of obtaining a license, certain educational experience and successful completion of an examination, which, obviously, only individuals are capable of satisfying. Thus, although both laws permit a corporate practice of architecture and engineering, under certain conditions, only individuals may be licensed. The Circuit Court was correct in denying the motion to dismiss on this ground.

JUDGMENT OF CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEES.