831 A.2d 1079

Glenn WATKINS, John Dillard, & Gerald Fuller,

v.

**SECRETARY, DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONAL SERVICES.**

No. 118, Sept. Term, 2002.

Court of Appeals of Maryland.

Sept. 9, 2003.

Stephen Z. Meehan (David C. Wright, Joseph B. Tetrault and Pauline K. White, on brief), Chestertown, for appellants.

Michael O. Doyle, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

The issue in this case is whether Division of Correction Directives (hereinafter "DCDs") 100–105, 100–508, and 100–543, governing the security classification of inmates of the Division of Correction (hereinafter the "DOC"), are *ex post facto* laws and thus violate Article I of the United States Constitution and Article 17 of the Maryland Declaration of Rights. We hold that DCD 100–105, DCD 100–508, and DCD 100–543 do not constitute "laws" within the meaning of the *ex post facto* clauses of the United States Constitution and Maryland Declaration of Rights because they were promulgated as guidelines for the exercise of discretionary administrative authority. Therefore, the DCDs in issue do not violate the constitutional prohibitions against *ex post facto* laws.

## I. Background

### A. The DCDs

As head of the DOC, the Commissioner of Correction (hereinafter the "Commissioner") has the responsibility for the division's operation and conduct. *See* Maryland Code, § 3–203 of the Correctional Services Article (1999). The Commissioner establishes the formal written policies of the DOC through the promulgation of DCDs, which are recorded and disseminated to ensure consistent and legally compliant agency operation. *See* DCD 1–3 V. As set forth under DCD 1–3, which governs the procedure for the development and publication of the DCDs, the directors of the programs within the DOC initiate the development of DCDs by drafting a new or revised

DCD and submitting that document to the Commissioner or Deputy Commissioner for review. *See* DCD 1–3 VI.E. If the Commissioner or his deputy approves the draft, the new DCD is then printed and distributed. *See id.* DCD 1–3 requires all new or revised DCDs to be signed by the Commissioner or, in his or her absence, the Deputy Commissioner, and the DCDs "shall remain in effect until rescinded by the Commissioner." *See* DCD 1–3 VI.A; DCD 1–3 VI.E.8.a. All personnel who participate in this development and approval process fall under the authority of the Commissioner.

### 1. Security Classification

The DOC operates facilities for the confinement of prisoners at four different security levels: maximum, medium, minimum, and pre-release. DCD 110–12.IV.2. Inmates classified at a level other than minimum security are subject to reclassification every 12 months. *See* DCD 100–005.II.N.3.a. DCD 100–005.II.T makes clear, however, that inmate reclassification occurs at the discretion of the Commissioner:

Notwithstanding the provisions of this or any other directive and consistent with the law, the Commissioner and those authorized by the Commissioner have the absolute discretion to modify, suspend, or terminate the case management process for any reason. Similarly, the Commissioner or the Commissioner's designees retain the discretion to modify the classification and/or assignment of any inmate at any time for any reason.

On January 2, 1974, DOC maintained a subjective inmate security classification policy. Transfers to minimum security and pre-release were based on a discretionary assessment by the DOC classification team. Although this policy changed over the next 14 years and certain inmates lost opportunities for pre-release, the general policy of the DOC did not exclude all inmates serving life sentences from the pre-release system. On January 18, 1988, DOC adopted a "point system" for classifying inmates, under which each inmate assigned a point value for certain objective factors. Based on the inmate's total score, he or she then was recommended for a certain

level of security. Still, under this system, no category of prisoner was precluded from progressing below medium security. On December 1, 1994, however, the DOC's formal policy declared that no inmates sentenced to life imprisonment could be transferred below medium security. On June 1, 1995, DOC issued DCD 100–005, which stated in part that, "[i]nmates serving life sentences shall be initially classified to no less than maximum security and shall not be reclassified below medium security." DCD 100–005.II.N.1.b. This section provides that an inmate who is serving a term of confinement for a rape or sex offense, "shall not be reduced below medium security unless approved for a delayed parole release contingent upon a transfer to lesser security . . . or unless within one year of a mandatory supervision release date or maximum expiration release date." DCD 100–005 was revised on January 16, 1996, and December 7, 2001, but the security classification limits on inmates serving life sentences and certain sex offenders remained in place.

## 2. Work Release

The statutory authority for a work-release program has existed since 1963, with the enactment of Chapter 285 of the Maryland Laws of 1963. Initially, only inmates whose sentences were 5 years or less could participate, but the General Assembly, in 1964, amended the statute to remove the limits as to which inmates were eligible. The current statutory provisions that govern the work-release program are located in Maryland Code, §§ 3–801—3–807 of the Correctional Services Article (1999 & 2002 Supp.). Under those provisions, an inmate seeking work-release may apply to the warden of the correctional facility in which the inmate is confined, and the warden then may recommend the application to the Commissioner of Correction. Maryland Code, § 3–801(c) & (d)(1) of the Correctional Services Article (1999). The Commissioner or the Commissioner's designee "may approve, disapprove, or defer action" on the application. Section 3–801(d)(4) states that, "[a]t any time and for any reason, the Commissioner may

revoke approval for an inmate to participate in the work-release program."

Prior to June 2, 1993, inmates serving life sentences had opportunities to obtain work-release privileges. *See* Division of Correction Regulation 155–2 (April 1, 1991) (allowing inmates serving life sentences the opportunity for work release after the initial parole hearing and with the Parole Commission's recommendation).[1] On June 2, 1993, after a life-sentenced inmate murdered his girlfriend and then committed suicide while on work-release, the Commissioner suspended the work release privileges of all inmates serving life sentences. On February 1, 1997, the DOC amended DCD 100–508, to render inmates serving life sentences "ineligible for work release." DCD 100–508.II.D states that an inmate "who has escaped during the current incarceration" "shall be ineligible for work release." [2]

### 3. Family Leave

Section 3–811 of the Correctional Services Article grants authority to the Commissioner to grant family leave. That section provides in part:

(a) *In general.* The Commissioner or Commissioner's designee may grant family leave to allow an inmate to visit the inmate's family for a reasonable time if the inmate:

(1) is confined in a correctional facility [of the DOC];

(2) is classified to be in prerelease status; and

(3) is recommended by the correctional facility's case management team and managing official.

Until June 2, 1993, when the Commissioner declared all life-sentenced inmates ineligible for family leave, inmates serving life sentences who had met the conditions of Section 3–811 and

---

**1.** Before July 1, 1991, DCDs were called Division of Correction Regulations, or DCRs. *See* Information Bulletin from Commissioner of Division of Correction, Richard A. Lanham (July 1, 1991).

**2.** The Commissioner issued three changes to DCD 100–508 on January 1, 2000, but the substance of those changes do not affect Appellants' claims in this case.

the other criteria of the DOC could receive family leave. On April 15, 1997, DOC issued DCD 100–543, which stated that "[i]nmates serving life sentences, including life with all but a portion suspended, and inmates under a sentence of death are not eligible for family leave consideration."

## B. The Inmates

This case originated in the Inmate Grievance Office (hereinafter the "Grievance Office"), which dismissed the grievances of three inmates of the DOC: Glenn Watkins, John Dillard, and Gerald Fuller. Although the central issue in this case—whether DCDs 100–105, 100–508, and 100–543 are unconstitutional *ex post facto* laws—is common to all three inmates, each inmate's grievance differs based on his individual circumstances.

### 1. Glenn Watkins

Glenn Watkins was convicted of first degree murder and, on May 5, 1972, began serving a life sentence with a concurrent sentence of fifteen years imprisonment. During his period of incarceration until June 2, 1993, when inmates serving life sentences, including Watkins, became ineligible for work-release and family leave, he successfully had completed 57 family leave furloughs and had participated in the work-release program. On June 1, 2000, Watkins filed a grievance with the Inmate Grievance Office (hereinafter the "Grievance Office") and stated:

> [My] complaint involves the promulgation of [DCDs] by former Commissioner of Correction, Richard Lanham, which permanently prohibit life sentenced inmates from progressing below medium security (DCD 100–005), from participating in work release programming (DCD 100–508), and from participation in family leave programming (DCD 100–543).[I] had actively achieved each of these security statuses before all life sentenced inmates were, supposedly, temporarily removed from the prerelease system on June 3, 1993.

He claimed that the DCDs "are in violation of the *ex post facto* clause[s] of the Maryland and United States Constitutions" and requested that they be "rescinded as illegal." On December 11, 2000, the Executive Director of the Grievance Office dismissed Watkin's grievance for the following reasons:

> [T]he Commissioner of Correction is responsible for the security of prisoners committed to his custody. As such, it is his responsibility to promulgate directives which establish the manner in which inmates are classified. The criteria for the various levels of security are subject to change as warranted by the Commissioner or his designees. When you were committed to the custody of the Commissioner of Correction, you became subject to various security policies that were in place at that time—and that were subject to change. A revision of Classification procedures is not the equivalent of an *ex post facto* law.

Watkins filed an action for judicial review in the Circuit Court for Anne Arundel County. In affirming the decision of the Grievance Office, the court ruled that the General Assembly has "accorded the DOC and the Commissioner authority to regulate within the Division of Correction" and the DCDs "come within the discretion of the Commissioner, constituting guidelines," which are "not subject to *ex post facto* prohibitions...."

### 2. John Dillard

On March 17, 1977, John Dillard was sentenced to 40 years of imprisonment for first degree rape, first degree sexual offense, and robbery with a deadly weapon. Sometime after being committed to the custody of the DOC, he was transferred to the Patuxent Institution. In April of 1983, Dillard was given a one-day leave from the institution but did not return as required. Authorities finally apprehended Dillard in Kansas on January 7, 1984, and he was returned to Patuxent on January 22 of that same year. Dillard was charged with escape, but the Howard County State's Attorney *nolle prosequied* the charge. Dillard never received a disciplinary sanction for the infraction.

In March of 1990, Dillard was transferred from Patuxent to the DOC. From June 1991 until September 1998, he served his sentence in minimum security. During this period in minimum security, Dillard's classification status was reviewed 12 times, and on at least 9 of those occasions, the objective point system for evaluating security classifications recommended reducing Dillard's security level to pre-release status. Despite the recommendations, the case management team overrode the point assessment every time and maintained Dillard in minimum security.

Dillard went before the Maryland Parole Commission for hearings in 1990, 1994, 1995, 1996, and 1997. Following each of these hearings, the Parole Commission indicated that Dillard needed to obtain work-release to test his suitability for parole release.

In June of 1996, Dillard was assigned to work detail that operated outside of the correctional institute. That November, the case management staff considered Dillard for pre-release status, but he was denied. Dillard then was removed from the work detail at his request. In April 1998, the Parole Commission issued a decision, granting Dillard parole release in April 1999 subject to the completion of six-months work release. The case management team at Central Laundry Facility approved a plan for Dillard, which provided for six-months of work release prior to April 1999. Nevertheless, when the plan was presented to the Commissioner for final approval, his designee denied that plan, stating that "[i]n accordance with DCD 100–508, an inmate who has escaped during the current incarceration is never work-release eligible." The Commissioner's designee offered, instead, six-months of pre-release work detail.

On July 8, 1998, the Parole Commission suspended Dillard's parole release date pending a hearing scheduled for September 1998. At that hearing, on September 18, 1998, the Parole Commission hearing officer recommended rescission of the release date and complete refusal of parole. The Parole Commission adopted the hearing officer's recommendation,

and Dillard was transferred to a medium security prison on October 1, 1998.

Dillard brought a grievance before the Grievance Office on January 13, 1999, alleging that DCDs 100–005 (security classification) and 100–508 (work release eligibility), which both became effective after Dillard was sentenced, constitute *ex post facto* laws. Dillard contended that DCDs 100–005 and 100–508 operated to prevent him from serving his sentence below medium security or obtaining work release. He also complained that the Commissioner's decision to deny him work-release was "arbitrary and capricious."

On June 24, 1999, the Executive Director of the Grievance Office dismissed Dillard's grievance "as being on its face wholly lacking of merit . . . ." The dismissal letter stated that the various security policies governing Dillard's confinement were subject to change as warranted by the Commissioner of Correction or his designee and that "[a] revision of the Classification procedures is not the equivalent of an *ex post facto* law."

Dillard filed an action for judicial review in the Circuit Court for Allegany County, which reversed the dismissal and remanded the case for a hearing to be conducted by the Office of Administrative Hearings. Following that hearing on July 13, 2000, the Administrative Law Judge concluded that Dillard had "not shown that DCDs 100–005 and 100–508 are ex post facto laws" because their application "did not increase the punishment of the crimes for which [he] was convicted."

Dillard again filed an action for judicial review in the Circuit Court for Allegany County, which heard the merits of his claim on October 12, 2001, and affirmed the decision of the Administrative Law Judge. The Circuit Court stated that Dillard's "contentions concern Directives for the administration of the prison . . . 'which every prisoner can anticipate are contemplated by his original sentence [and] are necessarily functions of prison management that must be left to the broad discretion of prison administrators.' " (quoting *Gaston v. Taylor,* 946 F.2d 340, 343 (4th Cir.1991) (en banc)).

### 3. Gerald Fuller

Gerald Fuller was sentenced to life imprisonment and committed to the custody of the DOC in October of 1979 after he pled guilty to first-degree murder, first-degree rape and robbery with a deadly weapon. On March 9, 2001, he filed a grievance in the Grievance Office, asserting that DCD 100–105 applied to prevent him from obtaining security below the level of medium security. According to Fuller, at the time he was sentenced, the security policies allowed him to progress to "minimum security . . . and pre-parole testing to demonstrate parole suitability," but DOC modified the security polices after his sentence to prevent him "from qualifying for parole release." On September 6, 2001, the Executive Director of the Grievance Office dismissed the grievance, reasoning that the DOC security policies, represented by the DCDs, were subject to change "as warranted by the Commissioner [of Correction] or his designees." As for Fuller's claim that the DCDs operated to deny him parole release, the Director characterized it as speculative and informed Fuller that the Grievance Office "has no jurisdiction over matters related to parole." The Director then suggested that Fuller contact the Parole Commission directly to discuss the matter.

On May 17, 2002, the Circuit Court for Washington County affirmed the decision of the Grievance Office. The Circuit Court explained its reasons:

> [Fuller's] sentence has not been enlarged by the modification of the DCDs. The [DCD's amendments], although increasing the level of security in which he must be maintained, did not affect him in a punitive manner. The changes were lawfully and appropriately made in order to allow the department to deal with perceived serious penological difficulties should lifers be continued on minimum security, work release or other less severe classification levels. Consequently, the implementation of DCD 100–005, viewed in isolation, does not violate the *ex post facto* prohibition of the State or Federal Constitutions.

The Circuit Court further stated that, because the Grievance Office has jurisdiction over complaints against officials or employees of the DOC or Patuxent Institution, it was not the proper forum for pursuing claims against the Parole Commission.

## C. The Present Appeal

Watkins, Dillard, and Fuller (hereinafter "Appellants") each appealed from the judgments of the circuit court that denied them relief. By order of the Court of Special Appeals on October 22, 2002, Appellants' cases against the Secretary of the Department of Public Safety and Correctional Services (hereinafter the "Secretary") were consolidated for the purpose of the appeal. Before any proceedings in the Court of Special Appeals, this Court issued a writ of certiorari. *Watkins v. Dep't of Corrections,* 372 Md. 763, 816 A.2d 111 (2003). In their brief, Appellants presented a single question, which we have rephrased for clarity:

As applied to Appellants, do DCDs 100–005, 100–508, and 100–543, which were promulgated by the Commissioner of Correction and established new security classifications, violate the constitutional prohibition against *ex post facto* laws?

We hold that the DCDs at issue in this case do not violate the prohibition against *ex post facto* laws, because they are not "laws" within the meaning of United States Constitution or Maryland Declaration of Rights. Rather, the DCDs were guidelines promulgated as an exercise of the discretion of the Commissioner of Correction who has authority to modify them. Therefore, we affirm the decisions of the Circuit Courts for Anne Arundel, Allegany, and Washington Counties.

## II. Standard of Review

The Administrative Procedure Act governs our review of decisions of the Grievance Office, an entity within the Department of Public Safety and Correctional Services. Maryland Code, § 10–222 of the State Government Article (1984, 1999 Repl.Vol.); Maryland Code, § 10–202 of the Correctional Services Article (1999). Because an appellate court reviews

the agency decision under the same statutory standards as the circuit court, we reevaluate the decision of the agency, not the lower court. *Gigeous v. Eastern Correctional Inst.*, 363 Md. 481, 495–96, 769 A.2d 912, 921 (2001) (citing *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362, 329 A.2d 691, 694–95 (1974)). Generally, "judicial review of administrative agency action is narrow." *Id.* at 496, 769 A.2d at 921 (quoting *United Parcel Service Inc. v. People's Counsel for Baltimore County*, 336 Md. 569, 576–77, 650 A.2d 226 (1994)). The reviewing court must not "substitute its judgment for the expertise for those persons who constitute the administrative agency." *Id.* at 496, 769 A.2d at 921 (quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 513, 390 A.2d 1119, 1124 (1978)). We must respect the expertise of the agency and accord deference to its interpretation of a statute that it administers. *See Board of Physician v. Banks*, 354 Md. 59, 68–69, 729 A.2d 376, 381 (1999); however, we "may always determine whether the administrative agency made an error of law." *Baltimore Lutheran High School v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985). Typically, such a determination requires considering "(1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision." *Id.* at 662, 490 A.2d at 708. Moreover, in cases that involve determining whether a constitutional right has been infringed, we make an independent constitutional appraisal. *See Crosby v. State*, 366 Md. 518, 526, 784 A.2d 1102, 1106 (2001) (citing *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612, 615 (2001); *In re Tariq A–R–Y*, 347 Md. 484, 489, 701 A.2d 691, 693 (1997); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990)).

## III. Discussion

Appellants argue that the DCDs at issue in this case amount to "laws" within the ambit of the *ex post facto* clauses. This is so, they claim, because they are "legislative rules" that prevent the staff of the DOC from exercising any discretion over assigning a lesser security classification, granting work release, or granting family leave. According to Appellants,

these "laws" unconstitutionally "enhance the punishment for Appellants' crime[s]" by "[a]ltering parole eligibility rules after the date of the offense for which the prisoner was committed." [3]

In the Secretary's view, the applicable DCDs do not constitute "laws" under the *ex post facto* clauses of the United States Constitution and Maryland Declaration of Rights. The Secretary advances the position that the DCDs merely enunciate the manner in which the Commissioner of Correction intends to exercise his discretion over establishing security classifications. According to the Secretary, the DCDs, therefore, are not laws but are guidelines which do not limit the Commissioner's exercise of discretion and may be changed "at any time for any reason." Nonetheless, even if the DCDs were "laws," the Secretary argues, "they do not violate the *ex post facto* prohibition because they do not lengthen any inmate's sentence or period of incarceration."

The federal prohibition against *ex post facto* laws can be found in Article I, Section 10 of the Constitution of the United States, which states in relevant part: "No State shall ... pass any ... ex post facto Law...." *Ex post facto* laws are also

---

**3.** Appellants also contend that the DCDs in issue create an *ex post facto* violation when they are applied in combination with the policies of the Maryland Parole Commission. They claim that the Parole Commission "has long standing policies requiring successful completion of work release and other forms of outside testing prior to a recommendation of parole to the Governor in a lifer case." Such a policy, according to Appellants, deprives them of an opportunity to achieve parole, for the DCDs prevent them from obtaining work release, family leave, or a status below medium security.

In this case, we need not address the merits of this contention. Appellants originally brought their claims before the Grievance Office, which has jurisdiction to hear complaints "against ... official[s] or employee[s] of the [DOC] or the Patuxent Institution." Code, § 10–206(a) of the Correctional Services Article. In fact, if a complaint is filed in the Grievance Office against an entity other than those named in Section 10–206(a), the Grievance Office Executive Director must dismiss the action. *See* COMAR 12.07.01.07 (2003). Charges that the Parole Commission is acting to limit Appellants' parole opportunities must arise in proceedings conducted in a forum where such controversies can be resolved.

prohibited under Article 17 of the Maryland Declaration of Rights, which states "[t]hat retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required." Maryland's *ex post facto* clause has been viewed generally to have the "same meaning" as its federal counterpart. *Gluckstern v. Sutton*, 319 Md. 634, 665, 574 A.2d 898, 913 (1990) (quoting *Anderson v. Dep't of Health & Mental Hyg.*, 310 Md. 217, 223, 528 A.2d 904, 907 (1987)).

The plain language of the *ex post facto* clauses make clear that the prohibition applies only to "laws." We highlighted this important requirement in holding that the *ex post facto* clause may be violated when the General Assembly enacts a statute that changes an inmate's eligibility for parole during his incarceration. *Gluckstern*, 319 Md. at 672, 574 A.2d at 916. In *Gluckstern*, we interpreted the *ex post facto* clauses to prohibit the retroactive application of a statute requiring the Governor to approve parole for inmates serving life sentences at the Patuxent Institution. *Id.* at 668, 574 A.2d at 914. The inmate who brought the claim in *Gluckstern* began serving a life sentence there when the Institutional Board of Review of the Patuxent Institution "retained exclusive control to parole a Patuxent inmate." *Id.* at 642, 574 A.2d at 901. The General Assembly subsequently enacted a statute that required the Governor to approve parole for all inmates serving life sentences. *Id.* at 643, 574 A.2d at 902. We concluded that the retroactive application of that statute, which modified the inmate's parole eligibility, " 'substantially alter[ed] the consequences attached to a crime already completed and therefore change[d] the quantum of punishment.' " *Id.* at 668, 574 A.2d at 914.

In analyzing the controversy in *Gluckstern*, however, we carefully distinguished that case from numerous federal cases, in which courts held the *ex post facto* prohibition to be "inapplicable to changes by the United States Parole Commission in the Commission's own discretionary guidelines for

granting parole." *Id.* at 671, 574 A.2d at 916. In so doing, we stressed that those federal opinions dealt with guidelines that "do not have the force and effect of law" but are merely "polic[ies] ... that show how agency discretion is likely to be exercised." *Id.* at 672, 574 A.2d at 916 (citations omitted). We further noted that those guidelines, as statements of discretionary administrative policy, "may not in fact augment [a prisoner's] punishment, either actually or potentially" because "the Parole Commission may choose not to follow the guidelines in [the prisoner's] case." *Id.* (citations omitted).

We again underscored the distinction between discretionary and non-discretionary administrative policy directives in *Lomax v. Warden, Md. Correctional Training Ctr.*, 356 Md. 569, 741 A.2d 476 (1999). There, we iterated that "the ex post facto prohibition applies only to a 'law' " within the meaning of the *ex post facto* clause. *Id.* at 576, 741 A.2d at 480. We recognized that, although in the context of the *ex post facto* clause, the "concept of a 'law' ... is broader than a statute enacted by a legislative body, and may include some administrative regulations," it does not encompass " 'guidelines assisting [a government agency] in the exercise of its discretion.' " *Id.* (citations omitted) (quoting *Portley v. Grossman*, 444 U.S. 1311, 1313, 100 S.Ct. 714, 715, 62 L.Ed.2d 723, 725 (1980)). Therefore, whether an administrative provision qualifies as a "law" for *ex post facto* purposes depends in large part on the manner and extent that it limits an agency's discretion. If the provision "do[es] not have the force and effect of law" but simply announces how an agency is likely to exercise its discretion, the *ex post facto* clause does not apply. *Id.* (quoting *Gluckstern*, 319 Md. at 672, 574 A.2d at 916 (citations omitted)).

In light of these principles, we considered in *Lomax* whether the Governor had executed an *ex post facto* law by issuing a statement that he would not approve parole for inmates serving life sentences unless they were very old or terminally ill. *Id.* at 573, 741 A.2d at 478. We concluded that:

> The Governor's statement ... was simply an announcement of guidelines as to how the Governor would exercise the discretion which he has under the law. The Governor's announcement did not bind him, and he can employ different guidelines whenever he desires to do so. Consequently, the Governor's announcement of " 'policies ... that show how ... discretion is likely to be exercised' " does not constitute a "law" within the meaning of the ex post facto prohibition.

*Id.* at 577, 741 A.2d at 481 (citation omitted).

We see no meaningful difference between the promulgation of the DCDs at issue in the case at bar and the Governor's statement of intent in *Lomax.* Just as the Governor possesses the authority to exercise discretion over parole decisions, the Commissioner has been vested with authority to establish the policies that govern the confinement of inmates in his or her custody. Maryland Code, § 3–203(a) of the Correctional Services Article (2002) provides that, "[s]ubject to the authority vested in the Secretary [of Public Safety an Correctional Services] by law, the Commissioner is in charge of the [DOC] and its units." Through this grant of authority, the Commissioner may create and alter the security classifications to ensure the effective execution of its supervision over the DOC. DCD 100–005, which precludes life-sentenced inmates and certain violent sex offenders from being housed below medium security, declares the manner in which the Commissioner intends to classify those committed to his custody. The Commissioner, at his discretion, may modify this directive at any time. *See Campbell v. Cushwa,* 133 Md.App. 519, 545, 758 A.2d 616, 630 (2000) (stating that Commissioner's authority to modify an inmate's security classification "for any reason" precluded a reasonable expectation that an inmate would remain in a particular security classification).

The Commissioner maintains similar discretion over the administration of work-release and family leave. The legislature conferred upon the DOC the discretion to establish a work-release program, Maryland Code, § 3–801(a) of the Correctional Services Article (2002), and the Commissioner, "[a]t

any time and for any reason ... may revoke approval for an inmate to participate in the work-release program." Code, § 3–801(d)(4) of the Correctional Services Article. Under Section 3–811(a) of the Correctional Services Article, the Commissioner or his designee "may grant family leave" to inmates within his custody, so long as the inmate is "classified to be in prerelease status" and has been recommended by the applicable "case management team and managing official." Through DCDs 100–508 and 100–543, the Commissioner has pronounced his policy that inmates serving life sentences should not be provided the privileges of work-release or family leave. The Commissioner may change this policy at any time. Because the DCDs merely communicate the Commissioner's intended use of discretion, they do not have the "force and effect of law." *See Gluckstern,* 319 Md. at 672, 574 A.2d at 916. Indeed, if the Commissioner elects to change his intentions and discard or alter the DCDs, they "may not in fact augment [a prisoner's] punishment, either actually or potentially." *See id.*

Appellants, however, disagree that the DCDs represent discretionary guidelines and, thus, are not "laws" under the *ex post facto* clause. In support of their position, they cite *Knox v. Lanham,* 895 F.Supp. 750 (D.Md.1995), in which Judge J. Frederick Motz of the United States District Court found a violation of the *ex post facto* clause in the combined operation of a Division of Correction Directive and an "unwritten policy" of the Parole Commission. The DCD at issue in *Knox* provided that "[a]n inmate with a life sentence, except an inmate sentenced to life with all but a portion suspended, shall not be reduced below medium security." *Id.* at 753. The "unwritten policy" of the Parole Commission, made evident by records of parole hearings, denied parole to all inmates who had not participated in work-release. *Id.* at 754. The combined effect of the DCD and Parole Commission policy rendered life-sentenced inmates completely ineligible for parole, even though at the time of their incarceration, parole had been a possibility. *Id.* at 758. This, Judge Motz decided, constituted a violation of the *ex post facto* clause. *Id.*

Appellant takes comfort in the *Knox* court's determination that the DCD in that case constituted a "law" as contemplated by the *ex post facto* clause. Judge Motz stated his reasoning:

> First, [the DCD] is a rule promulgated pursuant to legislatively delegated authority. The Commissioner of the Division of Correction has been delegated the authority to "adopt and promulgate reasonable rules and regulations for the operation and maintenance of the several institutions and agencies in the Division." Second, the rule is not merely a guide that leaves discretion with classification teams, wardens, or the Parole Commission, in the security classification of lifers. The new DCD 100–1 may not be "discarded where circumstances require," but is an inflexible rule that a lifer "shall not be reduced below medium security."

*Id.* at 756.

We are not persuaded by *Knox* that the DCDs in issue are "laws" under the *ex post facto* clause. As we recognized in *Lomax*, certain administrative rules may be considered "laws" for purposes of the *ex post facto* clause, 356 Md. at 576, 741 A.2d at 480, but if the rules are "merely guides" that "may be discarded where circumstances require" they are not subject to the *ex post facto* prohibitions. *See Prater v. U.S. Parole Comm'n*, 802 F.2d 948, 954 (7th Cir.1986) (quoting *Inglese v. U.S. Parole Comm'n*, 768 F.2d 932, 936 (7th Cir.1985)). Although the DCDs, like the one at issue in *Knox*, afford no discretion to the individuals carrying out the Commissioner's policies, it is not their discretion to which *ex post facto* analysis attaches.

We consider, rather, the extent of the Commissioner's discretion, as we did with the Governor's in *Lomax*. The Commissioner has discretion to establish policy guidelines for security classifications without legislative ratification. *See* Code, § 9–103(b) of the Correctional Services Article ("[E]ach individual sentenced to the jurisdiction of the [DOC] ... shall be held by, confined in, assigned to, or transferred to a correctional facility in the [DOC], as the [DOC] orders ....");

*see Paoli v. Lally*, 812 F.2d 1489, 1492 (4th Cir.1987), *cert. denied*, 484 U.S. 864, 108 S.Ct. 184, 98 L.Ed.2d 137 (1987) (stating that the purpose of Code, Art. 27 § 690(b), the predecessor to Section 9–103, is "to authorize the [DOC] to hold, assign and transfer prisoners among the State prison institutions as it deems necessary.") (quoting *Mullins v. State*, 12 Md.App. 222, 224, 278 A.2d 85 (1971)). Similarly, the Commissioner has discretion to establish policy regarding an inmate's eligibility for work release and family leave. For the purpose of carrying out those policies, the Commissioner, unilaterally, may adopt or discard whatever DCDs he or she deems appropriate. Whether DCDs 100–005, 100–508, and 100–543 bind the decisions of the Commissioner's employees does not affect the status of those DCDs as mere announcements of policy rather than *ex post facto* laws. Accordingly, we hold that DCDs 100–005, 100–508, and 100–543 do not violate Federal and State constitutional prohibitions against *ex post facto* laws.[4]

*JUDGMENTS OF THE CIRCUIT COURTS FOR ANNE ARUNDEL, ALLEGANY, AND WASHINGTON COUNTIES AFFIRMED. COSTS TO BE PAID BY APPELLANTS.*

---

**4.** As we indicated, the sole issue raised in this appeal is whether the DCDs at issue constitute *ex post facto* laws and, for that reason, are invalid under Article I of the United States Constitution and Article 17 of the Maryland Declaration of Rights. No argument was made that the DCDs constitute regulations under the Administrative Procedure Act, that they were adopted without compliance with the requirements of that Act, and for that reason they are unenforceable. *See Delmarva Power v. PSC*, 370 Md. 1, 803 A.2d 460 (2002). Nothing in this Opinion is intended to address that issue.