860 A.2d 896

CONSUMER PROTECTION DIVISION

v.

Paris G. GEORGE.

No. 12, Sept. Term, 2004.

Court of Appeals of Maryland.

Nov. 9, 2004.

506

William D. Gruhn, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Philip D. Ziperman, Asst. Atty. Gen., on brief), Baltimore, for Appellant.

No argument on behalf of Appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

The issue before the Court is whether the language, "to take affirmative action," found in the Consumer Protection Act, Md. Code (1975, 2000 Repl. Vol), § 13–101 *et seq.* of the Commercial Law Article ("Act"), permits the Consumer Protection Division to order a person adjudicated in violation of the Act to post a surety bond before engaging in further business transactions and to disclose certain financial information.[1] Our narrow holding is that § 13–403(b)(1) does not authorize the Division "to take affirmative action" either to require a violator of the Act to post a bond or to disclose financial information to aid the Division's enforcement of a cease and desist order. Thus, we affirm the judgment of the Circuit Court for Baltimore County.

### The Facts

Paris George, ("George"),[2] is the sole proprietor of a company that sells durable medical equipment and other supplies.

---

1. The Division states the issue as follows:

   Did the Consumer Protection Division err when, pursuant to § 13–403(b)(1) of the Consumer Protection Act, it ordered Paris George, who had repeatedly taken substantial amounts of money from consumers for medical goods and related services that George did not provide, to take affirmative action consisting of the posting of a security designed to prevent reoccurrence of his past violations and the disclosure of financial information to facilitate redress of past violations?

2. Although George participated in the administrative appeal to the Circuit Court sitting in Baltimore County of the Division's Final Order,

He operates out of his home under various trade names, including Allied Home Healthcare, Allied Healthcare, Allied Medical Equipment Co., Maryland Home Healthcare Services, Access Professionals, and Access Medical Equipment Co. He advertises in the yellow pages the sale and rental of durable medical equipment, i.e., wheelchairs, scooters, and stairlifts, as well as sickroom equipment, i.e., hospital beds, bed rails, and bathing equipment. His customers are seriously ill or disabled people or their families. The average consumer paid George more than $800.00 for equipment while others paid as much as $6,000.00.

In a hearing before Administrative Law Judge Beverly Sherman Nash ("ALJ"), the ALJ found that George violated the Consumer Protection Act, Md. Code (1975, 2000 Repl. Vol), § 13-101 *et seq.* of the Commercial Law II Article, the Door-to-Door Sales Act, Md. Code (1975, 2000 Repl. Vol), § 14-301 *et seq.* of the Commercial Law II Article, and the Merchandise Delivery Law, (1975, 2000 Repl. Vol.), § 14-1801 *et seq.* of the Commercial Law II Article. Specifically, the ALJ found that George engaged in repeated violations of the Acts by, among other things, failing to deliver the purchased items,[3] claiming to be an authorized dealer of a certain manufacturer when he was not,[4] failing to refund money after not

George did not participate in the proceedings before this Court either by counsel or *pro se.*

3. In one instance, a customer contacted George to purchase a chairlift. After George met with the customer and her husband in their home in February of 1999, the customer contracted to purchase a chairlift for $2,650.00. The customer gave George a deposit of $1,886.50 representing two thirds of the purchase price and sales tax of $134.75. George gave the customer a receipt indicating installation would take place in 30 days. After 30 days passed with no word from George, the customer repeatedly attempted to get in contact with George. He never returned the calls. Finally, in May of 1999, the customer contacted the Attorney General's Office and in August George refunded the deposit.

4. George claimed to be an authorized dealer of the chairlift company, Bruno Independent Living Aids, Inc. ("Bruno"). Bruno, however, had informed George that they would no longer do business with him when he failed to pay for his initial equipment order with the company.

delivering the product or after delivering nonconforming goods,[5] and charging sales tax on nontaxable items.[6] He also failed to properly notify customers of their rights to cancel orders and to provide written estimated delivery dates as required by law. When customers called to inquire about their ordered products, their calls often went unreturned. When customers did reach a live person at Allied, the person often identified himself as "Pat," an alias used by George, who informed them that George was unavailable or that he, Pat, would check on their items and call them back, which he would fail to do.

Based on the above violations, the Division issued a Final Order against George on June 24, 2002. George appealed to the Circuit Court for Baltimore County, the Honorable John F. Fader II, presiding. The circuit court affirmed the order in the following respects:

1. Ordering George to cease and desist from violating Maryland law;

2. Requiring George to make modifications to the contracts used by him so as to comply with Maryland law and to give fair notice to customers;

3. To provide refunds and restitution;

4. To require George to list his prior customers and the specifics of transactions with them, so as to identify and locate individuals who may be entitled to a refund from

---

Nevertheless, George continued to hold himself out as a dealer and sold seven Bruno chairlifts following the notification from Bruno. The seven orders were never forwarded to Bruno.

5. In one instance George entered into a contract to provide a hospital bed with a half rail and an extra wide wheelchair. He delivered a hospital bed with a full rail and a regular wheelchair. Despite repeated requests, George refused to deliver the conforming goods or refund the customers' money.

6. The ALJ found that George collected $9,832.92 in Maryland sales tax on medical devices that are not taxable. The money was deposited in George's regular bank account and was not forwarded to the Maryland State taxing authorities.

him, and to establish a claims process for those who are entitled to a refund;

5. To pay restitution in the amount of $32,510.92;

6. To establish a restitution account to be maintained by the Division for future claims against George; and

7. Imposing a civil penalty against George in the amount of $75,000 for violations of the consumer protection laws, and requiring that he pay the costs of the administrative proceedings in the amount of $4,357.

The circuit court reversed the order of the Division with regard to the following two provisions:

1. Requiring George to post a surety bond in the amount of $30,000 for the protection of future customers; and

2. Requiring George to list his assets, sources of income, and a list of all transfers of assets or payments in an amount greater than $1,000 to anyone in the previous two years.

In reversing the order regarding the bond, the circuit court noted that:

> [w]hile the court is aware of the general remedial purpose of the statutes to protect consumers, it is not convinced that the general right to "fence in" a person found to have violated the law includes the right to order the posting of a bond. . . . Where the Maryland Legislature has meant there to be a requirement for the posting of a bond, they have so provided as part of other statutory schemes.

With regard to the second issue, the disclosure of George's assets and transfers, the circuit court noted "[t]he statute does not give that authority; the Division can point to no specific case law interpreting any part of the State or Federal consumer protection statutes as giving this authority, and no case law interpretation can be strained or bent to say the authority exists."

On March 12, 2004, the court issued an order and monetary judgment against George in the amount of $111,867.92, repre-

senting the sum of the civil penalty, restitution order, and costs in the case.

The Division appealed the circuit court's conclusions regarding the surety bond and the financial disclosure provisions. The Division argues that "[t]he [Division's] Order against George furthered the purpose of the Consumer Protection Act, was issued pursuant to the [Division's] statutory authority and was reasonably tailored to address the violations committed by George...." We granted *certiorari* before consideration of the matter in the Court of Special Appeals. 380 Md. 617, 846 A.2d 401 (2004).

## II.

### *Standard of Review*

In *Watkins v. Dept. of Public Safety and Correctional Services*, 377 Md. 34, 831 A.2d 1079 (2003), Judge Battaglia, writing for this Court, summarized the relevant standard of review:

Because an appellate court reviews the agency decision under the same statutory standards as the circuit court, we reevaluate the decision of the agency, not the lower court. Generally, "judicial review of administrative agency action is narrow." The reviewing court must not "substitute its judgment for the expertise of those persons who constitute the administrative agency." We must respect the expertise of the agency and accord deference to its interpretation of a statute that it administers; however, we "may always determine whether the administrative agency made an error of law." Typically, such a determination requires considering "(1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision."

*Id.* at 45–46, 831 A.2d at 1086 (internal citations omitted).

In interpreting a statute we have said that the "predominant goal, when construing statutes, is to ascertain and implement the legislative intent." *Baltimore County v.*

*RTKL,* 380 Md. 670, 678, 846 A.2d 433, 437 (2004). In ascertaining the intent of the General Assembly we "look first to the words of the statute," *id.*; however,

> if the true legislative intent cannot readily be determined from the statutory language alone, we look to other indicia of that intent, including the title to the bill, the structure of the statute, the inter-relationship of its various provisions, its legislative history, its general purpose, and the relative rationality and legal effect of various competing constructions.

*RTKL,* 380 Md. at 678, 846 A.2d at 437–38 (internal citations omitted).

### The Consumer Protection Division

■ The Consumer Protection Division is entrusted with broad powers to enforce and interpret the Consumer Protection Act, Md. Code (1975, 2000 Repl. Vol), § 13–101 *et seq.* of the Commercial Law II Article. *Consumer Protection Division v. Consumer Pub'l Co.,* 304 Md. 731, 745, 501 A.2d 48, 55 (1985). In adopting the Act, the General Assembly concluded that "it should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland. It is the purpose of this title to accomplish these ends and thereby maintain the health and welfare of the citizens of the State." CL § 13–102(b)(3). The General Assembly further provided that the Act should be "construed and applied liberally to promote its purpose." CL § 13–105.

We summarized the statutory powers of the Division in *Consumer Publishing:*

> The statutory powers of the Division include the power to receive and investigate consumer complaints, initiate its own investigation of any possibly unfair and deceptive trade practices, issue cease and desist orders, adopt rules and regulations which further define unfair or deceptive trade practices or otherwise effectuate the purposes of the Act,

and seek a temporary or permanent injunction in a civil enforcement proceeding. §§ 13–204 and 13–403(c)(2). The statute further provides that the Division may "exercise and perform any other function, power and duty appropriate to protect and promote the welfare of consumers." § 13–204(11).

*Consumer Publishing,* 304 Md. at 745, 501 A.2d at 55.

The cease and desist provision of the statute is found at CL § 13–403(b)(1). It provides:

If, at the conclusion of the hearing, the Division determines on the preponderance of evidence that the alleged violator violated this title, the Division shall state its findings and issue an order requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property. The order shall contain a notice which states that if the Division determines that the violator has not corrected the violation and complied with the order within 30 days following service of the order, the Division shall proceed with enforcement pursuant to this title.

CL § 13–403(c)(2) provides:

To obtain compliance with its order, the Division may institute a civil proceeding, including a proceeding which seeks a restraining order and a temporary or permanent injunction.

CL § 13–406 provides:

(a) The Attorney General may seek an injunction to prohibit a person who has engaged or is engaging in a violation of this title from continuing or engaging in the violation. (b) The Attorney General shall serve notice of the general relief sought on the alleged violator at least seven days before the action for an injunction is filed. (c) The court may enter any order of judgment necessary to: (1) Prevent the use by a person of any prohibited practice; (2) Restore to a person any money or real or personal property acquired from him by means of any prohibited practice; or (3) Appoint a receiver in case of wilful violation of this title.

## *The Surety Bond*

The Division ordered George to post a surety bond in the amount of $30,000.00 within thirty days of the date of the Final Order.[7] The Order provides that the bond

---

7. The relevant section of the Final Order provides:

13. Within thirty (30) days of this Final Order, [George] shall either: (a) post a surety bond with the [Division], in a form acceptable to the [Division], in the amount of $30,000.00. (i) The Bond shall be issued by a surety licensed to do business in the State of Maryland and shall provide that [George] and the surety are held and firmly bound to consumers who suffer any loss in connection with their purchase of medical equipment, devices, supplies or related services from [George]. (ii) The bond shall permit any consumer who suffers any loss in connection with his or her purchase of medical equipment, devices, supplies or related services from [George] to file a claim for their loss with the surety and, if the claim is not paid, to bring an action based on the bond and recover against the surety; the bond shall also permit the [Division] to file a claim with the surety for any loss suffered by a consumer in connection with his or her purchase of medical equipment, devices, supplies or related services from [George]. (iii) The bond posted by [George] pursuant to this paragraph shall remain in effect until three (3) years from the last claim that is made against it, or if no claims are made, three years from the date it was first posted. (iv) [George] shall maintain accurate records of any bond posted under this Final Order, including records of the bond and premium payments made on it. Commencing ninety (90) days from the date of this Final Order, and annually thereafter for the duration of the bond [George] shall provide copies of all records maintained by him concerning the bond, including a copy of the bond itself and any documents reflecting premium payments made on it, to the [Division]. or (b) Provide the Proponent with a letter of credit or cash deposit in the amount of $30,000.00. (i) Consumers who suffer any loss in connection with their purchase of medical equipment, devices, supplies or related services from [George] shall have the right to file a claim for their loss against the letter of credit or cash deposit provided by [George]. The [Division] may also file a claim against the letter of credit or cash deposit for any loss suffered by a consumer in connection with his or her purchase of medical equipment, devices, supplies or related services from [George]. (ii) The [Division] may hold [George's] letter of credit or cash deposit for three (3) years from the last claim that is made against the letter of credit or cash deposit or if no claims are made three years from its receipt of the letter of credit or cash deposit. (iii) The Agency shall resolve all claims made by either consumers or the [Division] against [George's] letter of credit or cash deposit.

14. [George] Shall include in his contracts or order forms used to offer and sell medical equipment, devices, supplies or related services a written statement, in boldface type, at least 10 points or larger, that

shall permit any consumer who suffers any loss in connection with his or her purchase of medical equipment, devices, supplies or related services from [George] to file a claim for their loss with the surety and, if the claim is not paid, to bring an action based on the bond and recover against the surety; the bond shall also permit the [Division] to file a claim with the surety for any loss suffered by a consumer in connection with his or her purchase of medical equipment, devices, supplies or related services from [George].

According to the terms of the bond, it shall remain in effect for three years following the last claim made against it, or if no claims are made, for three years from the date that the bond is posted. In the alternative, George has the option of providing the Division with a letter of credit or cash deposit in the same amount, subject to the same rules, in lieu of posting the surety bond. Although the Division titled the bond a "surety bond," it is clear that the purpose of the bond is to insure performance of any contract George entered into with consumers.[8] Thus, for the purposes of our analysis, we shall

states as follows: "If you feel that you have suffered any loss in connection with your purchase of medical equipment, devices, supplies or related services, you may contact the Maryland Attorney General's Consumer Protection Division at (410) 576–6300 or by writing to Consumer Protection Division, 200 St. Paul Place, 16th floor, Baltimore, MD 21202."

15. [George] shall include in his contracts or order forms used to offer and sell medical equipment, devices, supplies or related services, the address and telephone number of any surety from whom [George] obtains a surety bond pursuant to this Final Order. [George's] contracts or order forms used to offer and sell medical equipment, devices, supplies or related services, shall also inform consumers of their right to file a claim against [George's] surety bond or any letter of credit or cash deposit held by the Consumer Protection Division.

16. If [George] believes that due to changed circumstances any of the specific prohibitions or affirmative obligations that are imposed by this Final Order should be changed, he may petition the Agency to amend this Order.

8. Black's Law Dictionary defines "surety" as: "A person who is primarily liable for the payment of another's debt or the performance of another's obligation." Black's Law Dictionary 1455 (7th ed. 1999).

treat the three options as a performance bond. *See* Black's Law Dictionary 1158 (7th ed. 1999) (defining "performance bond" as "a bond given by a surety to ensure the timely performance of a contract").

The trial court concluded that the Division exceeded its statutory authority by requiring the posting of a bond. The court noted the general remedial purpose of the Act but concluded that whenever the General Assembly has intended for the posting of a bond it has expressly done so in other statutes.

The Division contends that the authority to order the posting of a bond is encompassed within CL § 13–403(b)(1)'s grant of authority "to take affirmative action" when a person is found to have violated the Act. The Division argues that the bond will protect future customers by providing a financial incentive to George to actually deliver the ordered goods and services because he otherwise will not make a profit on the sale. The bond will also provide an efficient means of financial recovery to future customers, allowing them to purchase the necessary equipment from an alternative dealer should George fail to deliver the correct goods. It notes that in the interim between when the Division's Order was issued and when the appeal was pending in the circuit court, George continued to take money from consumers for medical-related equipment and services without providing the equipment or a refund.

The term "affirmative action" is not defined in the statute beyond the instruction that "affirmative action" includes "the restitution of money or property." CL § 13–403(b)(1). In *Consumer Publishing*, we stated that the affirmative action language authorized the Division to include "affirmative disclosure provisions" in future advertisements.[9] *Consumer Pub-*

---

For the definition of "surety bond," Black's says: "See Performance Bond." *Id.* at 172.

9. Pursuant to the cease and desist order issued by the Division, the violator was required to disclose with regard to the sale of its "diet" plan:(1) that dieting was required to lose weight; (2) every part of the plan that was necessary for someone to achieve significant weight loss;

*lishing,* 304 Md. at 772 n. 18, 501 A.2d at 69 n. 18. In *Consumer Protection Division v. Outdoor World Corporation,* 91 Md.App. 275, 603 A.2d 1376 (1992), the Court of Special Appeals applied the "affirmative action" language to authorize the Division to require that any future notices from an out-of-state campground sent into Maryland disclose, "in meaningful terms, what would be expected of the recipients should they attempt to claim any prizes [advertised in the notice] and what the likelihood is that they will receive a prize of any significant value." *Outdoor World Corporation,* 91 Md.App. at 290, 603 A.2d at 1383. And in *Luskin's Inc. v. Consumer Protection Division,* 353 Md. 335, 726 A.2d 702 (1999), we acknowledged the Division's authority to require a violator to take "affirmative action," but held that the cease and desist order in question imposed requirements that went beyond the deceptive practices engaged in by the violator in the underlying matter and was, therefore, too broad. *Luskin's,* 353 Md. at 380–82, 726 A.2d at 724–25.

We have addressed the meaning of the term "affirmative action" in cases involving the Commission on Human Relations, Md. Code (1957, 1972 Repl. Vol.), Art. 49B, which contained a provision with statutory language similar to the language in question here. Section 14(e) of Art. 49B authorized the Commission to issue a cease and desist order provided that:

> If upon all the evidence, the Commission finds that the respondent has engaged in any discriminatory act within the scope of any of these subtitles, it shall so state its findings.

---

(3) the active ingredients; and (4) a notice that "If you feel that this product does not live up to the claims we have made for it in our advertising, we would like to hear about it. Please notify us and the Maryland Consumer Protection Division." *Consumer Publishing,* 304 Md. at 772, 501 A.2d at 69. The Court noted that the U.S. Supreme Court has held that unlawful commercial speech is not protected by the First Amendment but declined to reach the ultimate question presented, whether the Division had the authority to require the disclosures in a national advertising campaign, because the issue was not raised at the administrative level. *Consumer Publishing,* 304 Md. at 772–775, 501 A.2d at 69–71.

The Commission thereupon shall issue and cause to be served upon the respondent an order requiring the respondent to cease and desist from the discriminatory acts and to take such *affirmative action* as will effectuate the purpose of the particular subtitle. (Emphasis added.) [10]

Expounding upon the term "affirmative action," in *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 520, 390 A.2d 1119, 1127 (1978), we said that the term "affirmative action" authorized the Commission to require an apartment complex "to initiate a program of tenant recruitment designed to reach minorities" after the apartment complex was found to have engaged in a discriminatory action in violation of § 14(e) of the Act.

In *Gutwein v. Easton Publishing Company,* 272 Md. 563, 325 A.2d 740 (1974), however, we held that the term "affirmative action" did not authorize the Commission to order monetary awards for compensatory or other damages resulting from the discriminatory practices. *Gutwein,* 272 Md. at 575, 325 A.2d at 746. Similar to the argument of the Division here that the purpose of the surety bond is to provide financial recovery for victims and protect future customers from fraud, it was argued in *Gutwein* that the purpose of the monetary award was "to make whole victims of discrimination as well as insure against future unlawful conduct." *Gutwein,* 272 Md. at 568, 325 A.2d at 743. We concluded that based on "the Commission's legislative background, the failure of [§ 13(e)] to specifically authorize an award of compensatory damages, the unlikelihood of a legislative grant of unbridled power to an administrative agency to make monetary awards without guidelines or limitations, and the [state and federal cases cited in the opinion]," that the Commission exceeded its statutory authority by awarding compensatory damages.[11] *Gutwein,* 272 Md. at 576–77, 325 A.2d at 747.

---

10. Now found at § 11(c). Md. Code (1957, 1998 Rep. Vol.) Art. 49B § 11(e).

11. The statute has since been amended by the General Assembly to authorize monetary awards, including back pay. Art. 49B § 11(c).

■ Based on the cases discussed above, it is clear that the term "affirmative action" may be used to justify a variety of actions taken by the Division when those actions are corrective measures that address the specific violations that are the subject matter of the Division's Final Order. *See Consumer Publishing,* 304 Md. 731, 501 A.2d 48; *Outdoor World,* 91 Md.App. 275, 603 A.2d 1376; *Bulluck,* 283 Md. 505, 390 A.2d 1119. It is equally clear, however, that the term "affirmative action" will not justify all actions taken by the Division simply because they are in furtherance of the purpose of the statute. *See Luskin's,* 353 Md. 335, 726 A.2d 702; *Gutwein,* 272 Md. 563, 325 A.2d 740. When the interpretation of "affirmative action" sought by the Division is not supported by the "relevant indicia of statutory intent," we will not uphold the Division's interpretation. *See RTKL,* 380 Md. at 678, 846 A.2d at 438 (noting that in interpreting ambiguous statutory language, "the [language] can take its proper meaning only by reference to other relevant indicia of legislative intent, the clearest and most pertinent evidence of which lies in other provisions of the statute . . .").

■ According to the Division's own assessment, the bond is designed to ensure future compliance with the Act. We agree with the Division that the requirement of posting a bond is an action in furtherance of the purposes of the statute. The bond will "assist the public in obtaining relief from [unlawful consumer] practices, and . . . prevent these practices from occurring in Maryland." *See* CL § 13–102(b)(3). If read in isolation, the term "affirmative action" may indeed justify the posting of a bond. We do not, however, read ambiguous statutory language in isolation. Here, the express language of the statute provides the Division a means of enforcing future compliance of its orders. The Division may institute other civil proceedings to restrain or enjoin continuing violations of its orders when a cease and desist order proves to be ineffective in stopping the unfair and deceptive practice. CL §§ 13–403(b)(1), 13–403(c)(2), and 13–406; *Outdoor World,* 91 Md. App. at 289, 603 A.2d at 1383 ("Sections 13–403 and 13–406 authorize the Attorney General to require violators of the

Consumer Protection Act to cease their violations and upon noncompliance, to seek an injunction against continued violations."). Because the plain language of the statute specifically addresses the steps to take in the case of noncompliance with the Act, we will not strain for a reading of the statute that would permit the same result as one expressly authorized. To do so would constitute a violation of the rule of statutory construction which requires that we "look first to the words of the statute. . . ." *RTKL,* 380 Md. at 678, 846 A.2d at 437. The Division has broad authority to construct the roadblock necessary to "close all roads to the prohibited goal," [12] it must do so, however, within the confines of the statutory authorization which in this case requires intervention of the courts.[13]

---

**12.** In *FTC v. Ruberoid,* 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952), in interpreting the authority of the FTC to prevent illegal practices in the future, the Supreme Court said:

> If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity.

343 U.S. at 473, 72 S.Ct. at 803, 96 L.Ed. at 1087.

**13.** We need not address whether, in an action to enforce a cease and desist order, a court would have authority under its general equitable power to require a violator of the cease and desist order to post a bond. But see CL § 13–406 which authorizes the Division to seek injunctive relief in consumer protection cases. *See also* § 13(b) of the Federal Trade Commission Act, 15 U.S.C.A. § 53(b), which permits the FTC to seek a preliminary or, in the proper case, permanent injunction when "a person, partnership, or corporation is violating, or is about to violate any provision of law enforced by the [FTC]." In a number of federal consumer protection cases, § 13(b) has been construed to authorize the posting of performance bonds as ancillary equitable relief. *See FTC v. SlimAmerica, Inc.,* 77 F.Supp.2d 1263 (S.D.Fl.1999); *FTC v. Wolf,* 1996 WL 812940 (S.D.Fl.1996); *FTC v. Career Assistance Planning, Inc.,* 1996 WL 929696 (N.D.Ga.1996); *FTC v. U.S. Sales Corp.,* 785 F.Supp. 737 (N.D.Ill.1992). The authority to grant ancillary relief, including the requirement of a performance bond, is derived from the court's equity jurisdiction.

In *US Sales Corp.,* the court interpreted § 13(b) of the FTC Act, and held that the Act authorizes a performance bond because

> ancillary equitable relief is necessary to accomplish complete justice in this case. Merely prohibiting the advertisements discussed in this opinion is insufficient, especially considering Defendants' contemptu-

■ The Consumer Protection Division and the Attorney General of Maryland, like the Federal Trade Commission, clearly have a mandate "to protect the consumer" from "deceptive practices." *See* CL § 13–102; *Consumer Publishing*, 304 Md. at 765, 501 A.2d at 66. Not unlike the FTC which has "wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practice disclosed," (*Ruberoid*, 343 U.S.

---

ous behavior in violating the Preliminary Injunction Order. Ancillary equitable relief will be necessary to effectuate enforcement of Section 5 of the FTC Act and to deter future violations by these Defendants. The court concludes therefore that the permanent injunction should require Defendants to obtain a performance bond for any future sales of credit card or auction information.
*US Sales Corp.*, 785 F.Supp. at 753.

In *SlimAmerica*, the defendants engaged in deceptive practices in connection with the sale of ineffective weight-loss products. The court ordered ancillary equitable relief in the form of a requirement that the defendants post a performance bond before engaging in any business related to weight-loss specifically and telemarketing in general. *Slim-America*, 77 F.Supp.2d at 1276. The court noted that "ancillary equitable relief is necessary to protect consumers and ensure that the defendants do not perpetrate new frauds." *Id.* Accordingly, the court concluded, "that a performance bond requirement is an appropriate remedy to protect consumers and prevent defendants from engaging in further deceptive practices." *Id.*

In *Wolf*, the defendants violated the FTC Act by employing deceptive telemarketing techniques in connection with a scheme that promised substantial returns on business opportunities offered by the defendants. *Wolf*, 1996 WL 812940 at 1. After noting that "[b]road injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise," the court ordered the defendants to post a $5,000,000 performance bond before engaging in any form of telemarketing. *Wolf*, 1996 WL 812940 at 8–9. The court concluded that "[t]he telemarketing skills mastered by the defendants make it imperative that the public be protected from future exploits by them." *Wolf*, 1996 WL 812940 at 9.

And in *Career Assistance Planning*, the defendants violated the FTC Act by failing to deliver promised college scholarship information, misrepresenting the success rate of its customers, and using credit card information without authorization. *Career Assistance Planning*, 1996 WL 929696 at 1–2. The court concluded that the FTC was entitled to all ancillary relief it sought, including the requirement that the defendants post a performance bond before engaging in telemarketing sales in the future. *Career Assistance Planning*, 1996 WL 929696 at 4. The court agreed with the FTC that "in light of the [defendants'] proven propensity to engage in fraud and to refuse cooperation with law enforcement authorities," the posting of a performance bond was warranted. *Id.*

at 473, 72 S.Ct. at 803, 96 L.Ed. at 1087 (internal citation omitted)), the Maryland Consumer Protection Division also has "broad powers to enforce and interpret the Consumer Protection Act." *Consumer Publishing*, 304 Md. at 745, 501 A.2d at 55. Those broad powers, however, must fit within the statutory scheme established by the General Assembly.

### Financial Disclosures

The "Restitution" section of the Division's Final Order provides that within 30 days of the date of the Final Order, George must pay the Division $32,510.92, to be placed in an account for the payment of restitution to consumers. A mechanism for determining individual consumer claims is also set forth in the Order. Additionally, if the $32,510.92 proves to be insufficient for satisfying claims against George, the Division is required to notify him of any necessary additional sums. George would then have 14 days to comply by submitting the additional funds. The two provisions of the restitution section in question on this appeal state:

31. [George] shall, within forty-five (45) days of the date of this Final Order, provide the [Division] with a complete listing of all of his assets and sources of income. The listing shall cover all assets in which [George] has any interest whatsoever. The listing shall fully identify any banks or similar institutions in which [George] has deposited money or other assets.

32. [George] shall, within forty-five (45) days of the date of this Order, provide the [Division] with a complete listing of all transfers of assets he has made within the past two (2) years and of all payments he has made to anybody in the amount of $1,000 or more within the past two (2) years.

The trial court reversed the Final Order regarding the two provisions mentioned above, stating that

[t]he statute does not give that authority; the Division can point to no specific case law interpreting any part of the State or Federal consumer protection statutes as giving this

authority and no case law interpretation can be strained or bent to say the authority exists. As a follow through, the Division points to Rule 2–633 allowing a creditor to take steps in aid to enforce a judgment. Simply stated, the Division does not yet have a judgment.[14]

The Division, on the other hand, contends that the authority to require the disclosure is encompassed in CL §§ 13–403(b)(1) and 13–410 which authorize the Division to order restitution and civil penalties. As previously noted, George has been ordered to pay $32,510.90 in restitution and $75,000 in civil penalties. The disclosure provisions, according to the Division, are designed to facilitate the payment of the money owed by George. It contends that, "[r]equiring George to provide [the financial] information was a reasonable exercise of the [Division's] authority to order affirmative action, including the payment of restitution ... and fulfill the General Assembly's stated purpose of 'assisting the public in obtaining relief from these [unlawful] practices'."

▆▆▆ There is no doubt that the Division may order an alleged violator to pay restitution if, based on a preponderance of the evidence, the Division determines the alleged violator violated the Act. CL § 13–403(b)(1). The Division may also assess civil penalties, not to exceed $1,000 per violation of the Act, for first time offenders, (CL § 13–410(a)), and not more than $5,000 per subsequent violation. CL § 13–410(b). The question is whether the Division's authority to assess penalties encompasses the authority to enforce the penalties through the disclosure of financial information as a requirement in a cease and desist order. We hold that it does not.

We have held that an order of restitution pursuant to the Act is intended to divest a violator of " 'benefits it would be unjust for him to keep.' " *Luskin's Inc. v. Consumer Protection Division,* 353 Md. 335, 383, 726 A.2d 702, 726 (1999) (discussing the purpose of restitution verses damages and

---

14. The Division subsequently obtained an Order of Judgment against George in the amount of $111,867.92 on March 12, 2004.

finding that an order of restitution is " 'not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep.' ") (quoting *Consumer Publishing*, 304 Md. at 776, 501 A.2d at 71); *State v. Andrews*, 73 Md.App. 80, 89 n. 7, 533 A.2d 282, 287 n. 7 (1987) ("To permit the [retention of] even a portion of the illicit profits would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved.") (quoting *Consumer Publishing*). To this end the General Assembly has expressly authorized the Division to apply to a court for an "order of judgment necessary to restore to a person any money or real personal property acquired from him by means of any prohibited practice." CL § 13–406(c).

In this case, the order of restitution represents money George took from consumers in violation of the Act. Clearly, it would be unjust for George to continue to profit from his behavior by eluding the restitution order. The proper procedure for preventing this outcome, according to the express language of the statute, is for the Division to obtain a judgment. Armed with a money judgment, the Division could obtain information to aid in its enforcement of the judgment. *See* Md. Rule 2–633(a) (Circuit Court) ("A judgment creditor may obtain discovery to aid enforcement of a money judgment (1) by use of depositions, interrogatories, and request for documents."); Md. Rule 3–633(a) (District Court) ("A judgment creditor may obtain discovery to aid enforcement of a money judgment (1) by use of interrogatories pursuant to Rule 3–421.").

On March 12, 2004, the Division obtained a judgment against George in the amount of $111,867.92. Pursuant to the above mentioned rules the Division is in the position to enforce the judgment. The Division erred by seeking the information prior to receiving an order of judgment from a court of appropriate jurisdiction.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED WITH COSTS.**